COLBERT, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 9—June 23, 1905.*

*Criminal law and practice: Assistant to district attorney: Appointment: Discretion: Statutes: Arson: Information: Election between counts: Amendments: Trial: Evidence: Identity: Clergymen: Privileged communications: Experts: Handwriting: Appeal: Exceptions: Witnesses: Credibility: Record of previous convictions: Instructions to jury: Immaterial error: Circumstantial evidence: Admissions.*

1. Sec. 750, Stats. 1898, provides that, in certain specified cases, trial courts may, by order entered in the minutes, "stating the cause therefor," appoint a suitable person to act as district at-

torney *pro tem.* The section then provides that the courts may "in the same manner and in their discretion appoint counsel to assist the district attorney in the prosecution of criminal cases." *Held*, that in the latter case the words "in the same manner" do not require the statement of the cause, but simply require that the order be entered in the minutes as an order appointing a district attorney *pro tem.* is entered.

2. In a criminal prosecution, objection having been made to the attorney appointed to assist the district attorney, the evidence, stated in the opinion, is *held* to show that he was unprejudiced, not under any other retainer in the case, and his appointment within the discretion of the trial court.

3. In a criminal prosecution for arson the information contained three counts, stated in the opinion. Before pleading to the information, motions were made by the defendant to compel the state to elect on which count it would proceed; also to quash each separate count of the information—all of which motions were overruled, leave being granted to the defendant to renew the motion to require an election at a subsequent stage of the trial. At the close of the state's case the district attorney was allowed, against objection, to amend the first count of the information and then elect to proceed upon the count as amended. *Held*, no error was thereby committed:

(1) The matter of requiring an election being within the sound discretion of the trial court, and the various counts all plainly referring to the same act, there was nothing in them tending to mislead or embarrass the defense or distract the attention of the jury.

(2) The evidence received was applicable to each count, and hence there was no error in not requiring an election at the outset.

(3) The amendments simply added greater detail, and were not essential because the counts, as originally framed, sufficiently charged the crime of arson under sec. 4400, Stats. 1898.

4. Under sec. 4400, Stats. 1898 (denouncing a penalty for maliciously and wilfully burning the dwelling-house of another), where the fire that consumed a dwelling-house originated in another building, it is not required that the malicious intent to burn the dwelling-house should exist.

5. In a criminal prosecution, expert evidence as to the identity of an anonymous letter, alleged to have been written by the defendant, was *held* sufficient to justify the reception of the letter in evidence.

6. In a criminal prosecution it is not error to allow a clergyman to testify to a conversation with the defendant, when there

was no confession and it was apparent that he was not acting in his professional character at the time.

7. In a criminal prosecution one issue was whether an anonymous letter was in the handwriting of the defendant. On this issue an expert in handwriting, after a lengthy and elaborate comparison of documents admitted to have been written by defendant, testified that, in his opinion, the anonymous letter was written by defendant. *Held*, that it was no abuse of discretion, after defendant's counsel had presented to the witness a copy of the anonymous letter in the handwriting of defendant, to refuse to compel the witness to answer, offhand, as to the identity of the handwriting of the original and copy.

8. In such case, remarks of the court in connection with its ruling, stated in the opinion, while criticised, are *held* in themselves insufficient to reverse the judgment.

9. In a criminal prosecution, where an expert in handwriting has before him several papers admitted to be written by defendant and all but one admitted to be in the normal handwriting of defendant—that one being claimed to have been written while defendant's hand was guided by another,—the expert may testify whether, in his opinion, the remaining one is in defendant's normal handwriting.

10. Where no exception is preserved to a ruling of the trial court that ruling cannot be considered on appeal.

11. In a criminal prosecution, after evidence tending to show that the defendant lived in M. in 1889, and was known as Lucy or Lucille La Blanc or La Blanche, a certified copy of the record of the conviction of one Lucy La Blanche for violation of one of the city ordinances of M., on November 18, 1889, was received in evidence. *Held*, that notwithstanding the defendant's denial that she was in M. at this time, and that she had ever been convicted, the evidence showing identity of name was sufficient to establish *prima facie* identity of the person and to authorize the reception of the testimony as bearing on the question of her credibility, under sec. 4073, Stats. 1898.

12. In the course of the instructions to the jury the court stated there had been offered in evidence the record of the conviction of one Lucy Colbert (defendant's name), whereas the record showed the conviction of Lucy La Blanche. *Held*, not prejudicial, since it was so evidently a slip of the tongue that none could have been misled by it, and the jury were distinctly told that it was for them to determine whether the person so convicted was the defendant or not.

13. In a criminal prosecution a requested instruction on the subject of circumstantial evidence, stated in the opinion, was *held* to

be substantially a correct statement of the law and its refusal prejudicial error, because not covered by the general charge.

14. In a criminal prosecution the court, having correctly charged the jury on the subject of credibility of witnesses, gave an instruction: "The same rule applies in other evidence, contradictory statements made by the defendant or any other witness on the stand. If you find they have made statements contrary to the truth, the rule which I have just read to you comes into play; that is, you may disregard the testimony of that witness *whom you find beyond a reasonable doubt to have sworn falsely*," which is *held* prejudicially erroneous although a correct proposition on the same subject had previously been given.

15. In a criminal prosecution the court, having given a requested instruction on the subject of admissions made in casual conversations, added: "This is true. But bear in mind that admissions may be very important and very weighty testimony. It is for you to determine the weight and value that should be given to these admissions, and to all the testimony in fact which has been produced in this case." *Held*, that while abstractly the added clause was correct as far as it went, the court should have told the jury that an admission, in order to be important and weighty, must be clearly proven and shown to have been made with some degree of deliberation.

16. It is not error to refuse a requested instruction on the subject of expert evidence and the weight thereof, consisting of a long philosophical discussion taken bodily from one of the opinions of the supreme court, and which was not fitted nor intended for the instruction of a jury.

ERROR to review a judgment of the circuit court for Outagamie county: JOHN GOODLAND, Circuit Judge. *Reversed.*

The plaintiff in error was prosecuted and convicted of the crime of arson and brings writ of error.

At about 4:40 o'clock on the morning of July 11, 1902, a small frame building occupied by the plaintiff in error (hereafter called the "defendant") as a millinery store and residence on the principal street of the village of Welcome (formerly Bear Creek), in Outagamie county, was found to be on fire, and the building, with its entire contents, was totally destroyed, the fire spreading and causing the destruction of a number of other frame buildings, among them being the

residence of one Thorn.   The defendant had left the build-
ing a few minutes before the fire and gone to the railroad
station, which was just across the street, where she expected
to take a train due at 4:43 for New London, Wisconsin,
having purchased her ticket and checked her trunk on the
preceding day.   The fire was discovered while she was wait-
ing for the train at the station, and she returned to the build-
ing, protesting that there was no fire in it when she left and
that she had not even lighted a match in it that morning.
The fire was also communicated to the railroad station build-
ing, and her trunk, with its contents, was destroyed.   The
defendant had insurance on her stock to the amount of $200
and upon her household goods to the amount of $100.   The
value of these articles was in some dispute, but the aggregate
value did not materially exceed the insurance thereon if in
fact it equaled the insurance.   She afterwards settled with
the insurance companies for 'about $250.   The defendant
was a widow about sixty years of age.   Her maiden name
was Lucille, or Lucie, or Lucinda La Duc.   Her first hus-
band, to whom she was married in the year 1858, was named
La Blanc or La Blanche.   By him she had five adult chil-
dren, none of whom were living with her at the time of the
fire nor for some years before.   La Blanc died in 1892, after
which defendant supported herself by her own efforts, and
married one Colbert in 1899, who died very soon after the
marriage, leaving no children.   The defendant commenced
the millinery business in Welcome in the year 1901, was
burned out without any insurance in April, 1902, but saved
about $200 worth of goods and re-established the business.
After settling with the insurance companies she engaged in
the millinery business in New London.   She filed a claim
with the railroad company for the loss of her trunk and con-
tents, but it was not paid, and thereafter she brought suit
against the company for damages for the destruction of the
trunk.   The present prosecution was not commenced till

some time after the fire.  The defendant was a witness upon the trial, and strenuously denied all knowledge of the origin of the fire.

For the plaintiff in error there was a brief by *J. E. Lehr,* attorney, and *Pierce & Lehr, A. M. Spencer,* and *Maurice McKenna,* of counsel, and oral argument by *Mr. Lehr* and *Mr. McKenna.*

For the defendant in error there was a brief by the *Attorney General, Walter D. Corrigan,* assistant attorney general, and *F. M. Wilcox,* district attorney, and oral argument by *Mr. Corrigan.*

Winslow, J.  The assignments of error are numerous. Those which seem necessary to be considered in order to guide the trial court upon a new trial will be considered in their order.

1. At the opening of the trial the late Lyman E. Barnes, of Appleton, appeared as an attorney assisting Mr. Wilcox, the district attorney, in the prosecution, and objection was made to his participation in the trial, based on affidavits tending to show on information and belief that he was the general attorney for the Chicago & Northwestern Railway Company at Appleton and was employed by that company to prosecute this action in order to defeat *Mrs. Colbert's* claim against the company for the loss of her trunk.  No order had at this time been entered on the minutes appointing Mr. Barnes to assist the district attorney.  Mr. Barnes was then sworn, and stated that he was asked by Mr. Wilcox to assist in the prosecution of the case at the preceding April term of the court, and that he was then verbally appointed in open court; that he was local attorney of the Chicago & Northwestern Railway, but that no one connected with the company ever communicated with him about the case or employed him, and that he was getting no pay from that company; that he knew nothing about the baggage suit

and never heard of it until that moment, and that he expected his pay from Outagamie county alone, and no one else. Upon this showing the trial court directed that an entry be made upon the minutes of the court that Lyman E. Barnes "is appointed by the court, at the request of the district attorney, to assist him in prosecuting the case," and that the minutes should further show that the appointment had been made verbally by the court in the latter part of April, 1903. Exception was taken to this order, and this is the first alleged error to be considered. This order was made under the power granted by sec. 750, Stats. 1898, which provides that in certain specified cases, such as the absence or disqualification of a district attorney and other cases, the trial court may, by order entered in the minutes, "stating the cause therefor," appoint a suitable person to act as district attorney for the time being. The section then provides that the courts may "in the same manner and in their discretion appoint counsel to assist the district attorney in the prosecution of criminal cases." The appointment here was made under the second subdivision of the section, and the first claim is that the order is erroneous because it does not state the cause. Whether such an omission would be good cause for reversing a conviction in any case may be justly doubted, but, in any event, we do not consider that the words "in the same manner" require the statement of the cause, but simply require that the order be entered in the minutes as an order appointing a district attorney *pro tem.* is entered. Mr. Barnes's testimony, which in its essential statements was undisputed, showed that he was unprejudiced, and not under any other retainer in the case, and hence his appointment was within the discretion of the trial court. *French v. State,* 93 Wis. 325, 67 N. W. 706.

2. The information contained three counts. The first count charged, in substance, with proper formal averments, that the defendant did in the daytime of July 11, 1902, wil-

fully, maliciously, and feloniously set fire to and burn one certain frame building, the property of one Mary M. Dempsey, occupied by the defendant as tenant, by the firing and burning of which the dwelling-house of one Thorn (the location of the house being fully set forth), the said Thorn being the owner and occupant of the house, and one Ballhorn being the owner of the lot on which it stood, was wilfully, maliciously, and feloniously set on fire and burnt. The second count charged the wilful, malicious, and felonious burning in the daytime of the frame building in which the fire originated; and the third count charged the wilful, malicious, and felonious burning of the same building in the daytime, and that it was then occupied by the defendant as a dwelling-house. Before pleading to the information, motions were made by the defendant to compel the state to elect on which count it would proceed; also to quash each separate count of the information,—all of which motions were overruled, leave being given to the defendant to renew the motion to require an election at a subsequent stage of the trial. At the close of the state's case the district attorney was allowed, against objection, to amend the first count of the information and then elect to proceed upon that count as amended. In these rulings we have found no error. The matter of requiring an election was within the sound discretion of the trial court. The various counts all plainly referred to the same act, and there was nothing in them tending to mislead or embarrass the defense or distract the attention of the jury. Furthermore, all the evidence received was equally as applicable to the first count as to the second or third; hence there was no error in not requiring an election at the outset. The second and third counts having dropped out of the case, there is no necessity to consider the question of their sufficiency. The amendments to the first count were not substantial, but simply added greater detail to the descriptions of the two buildings, which we do not regard as essential for the reason that

the count as originally framed sufficiently charged the crime of arson under the second clause of sec. 4400, Stats. 1898, which punishes the wilful and malicious setting fire to any building by the burning whereof the dwelling-house of another shall be burned in the daytime.

3. At the close of the state's case the defendant moved that a verdict of "not guilty" be directed for failure of proof. This motion was overruled, and this ruling is assigned as error. No argument is made by the defendant in this court upon the general proposition that the facts in evidence would not justify a finding that the defendant wilfully set the fire, but it is argued that the dwelling of Thorn was so far removed from the building where the fire originated that malice cannot be imputed to the defendant. It appears that the Thorn building was between seventy and eighty feet distant from the store building of the defendant, with two buildings and three narrow alleys intervening. The difficulty with the argument is plain upon examination of the statute. The statute only requires that the first building shall be maliciously and wilfully set on fire and that by the burning thereof the dwelling of another shall be burned. It is not required that the malicious intent to burn the dwelling-house shall exist.

4. It appeared by the evidence that on the 19th of January, 1903, Rev. Father Pellegren, the Roman Catholic priest at Welcome, received an anonymous letter, written in pencil, and covering about five pages of note paper, which purported to be a confession by a man then in a hospital in Chicago, to the effect that he was a suitor of the defendant in his youth and had been rejected by her, and that he was in Welcome at the time of the fire and deliberately set fire to the building after he saw her leave it, for the purpose of revenge. The letter was very badly spelled, and was apparently the production of an illiterate person. It closed with a request that it be published, so that people would cease to misjudge

others. Four days after receiving this letter Father Pelle-
gren took it to New London and read it to the defendant. He
testified that she was excited, and that she wrote at his dic-
tation and gave to him a statement as follows:

"Pleas, I declare that no stranger spoke to me on July 10,.
192, that I had now ideay how the fire started, I dellare that
the lettler is unknown to me.        MRS. L. COOLBERT."

That she asked him to publish the first letter, and that he
read it in church on the following Sunday. These two let-
ters were introduced in evidence, and marked respectively
Exhibits "L" and "M," and a number of questions are raised
concerning them. Before they were admitted the priest had
testified that he saw *Mrs. Colbert* write Exhibit M, and that
upon comparison of the handwriting in the two papers he
believed that the same person wrote them both. Mr. John
F. Tyrrell, an expert in comparison of handwritings, also
testified, after examination of the two papers, as well as sev-
eral other papers admitted to have been written by defendant,
that in his judgment Exhibit L was written by defendant..
It is true that different conclusions as to the authorship of
Exhibit L were reached by other witnesses, who were called
as experts by the defendant, but this evidence simply made a
question for the jury to determine. The evidence of iden-
tity was certainly sufficient to justify the reception of the
letter in evidence.

It is objected that the court erred in allowing Father Pel-
legren to testify to his conversation with the defendant be-
cause under sec. 4074, Stats. 1898, a clergyman is not al-
lowed to disclose a confession made to him in his profes-
sional character without the consent of the party confess-
ing; but this objection is plainly untenable, because there
was no confession, and further because it is apparent that
he was not acting in his professional character at the time.

Upon cross-examination of the witness Tyrrell defendant's
counsel presented to the witness a copy of the anonymous

letter (Exhibit L), which copy was claimed to have been
written by *Mrs. Colbert*, and asked him to state whether,
in his opinion, it was in the same handwriting as Exhibit L,
to which the witness replied that he declined to give an opin-
ion offhand, and would give no opinion without taking time
to make a careful examination.    Several other writings were
presented to him, with the same result.    Upon demand of
counsel that the witness be compelled to reply at once, the
state's counsel stated that they would have the witness re-
main a week or a month, and have him make a careful exam-
ination of the writings presented if it was desired.  The court
ruled, in effect, that he would not compel an offhand answer.
In the course of the colloquy on the subject the court said:

"I do not think the offer you make tends to do that.  I do
not think it is a fair offer.    I don't think it is a fair offer
to the witness.    The testimony of the witness, as I under-
stand it, is not given of expert handwriting like the testimony
often is by bank cashiers and others.    The testimony of this
witness has been based upon an elaborate and somewhat
lengthy comparison of certain documents.  If you want him
barely to express an opinion as to those exhibits which you
offer, let him do so.    There is no objection to that.  But there
is an objection to undertaking to impeach deliberate and
elaborate and thoroughly studied conclusions by an offhand
expression of opinion."

Exception was duly taken to these remarks, as well as to
the ruling of the court, and these exceptions are vigorously
urged upon us.    The trial court has necessarily a large dis-
cretion in the matter of the examination of witnesses, and is
charged with the duty of regulating the examination so that
witnesses shall be fairly treated.    The trial court is also in
much better position to judge as to what constitutes fair or
unfair treatment of a witness than this court can be, and we
see no abuse of discretion in the present case, but rather a
manifest attempt to insure for the witness that fairness of
treatment to which every witness is entitled.    It would have

been better if the court had not attempted to differentiate in his remarks between two supposed classes of expert evidence, because such remarks might possibly be understood to unduly dignify the character and credibility of the evidence given by the witness on the stand. It is to be wished that the ruling had been made without the accompanying remarks, but, were this the only matter to be criticised in the record, we certainly should not reverse the judgment.

There was testimony given by the defendant and one other witness to the effect that the priest guided the hand of the defendant while she was writing Exhibit M. This was denied by the priest, and upon rebuttal the expert Tyrrell was asked whether, assuming that certain papers in evidence were in the genuine handwriting of defendant (and they were admitted to be genuine), could Exhibit M have been written as it was, with the priest holding defendant's hand. He replied that in his opinion it was not a guided hand. Again, he was asked whether it would be possible for a person to write in a normal manner with another person having hold of the end of the pencil and doing the guiding, and he replied that it would not. Also in answer to the question whether this writing showed any evidence of a guiding hand he replied that it did not. It would not require expert evidence to establish the fact that where the hand or pencil of a person engaged in writing is guided by the hand of another person the result could not be the normal handwriting of either person. This must be common knowledge. We think also that when an expert has before him several papers admitted to be written by the same person, and all but one admitted to be in his or her normal handwriting, he may testify whether, in his opinion, the remaining one is in the normal handwriting. It may well be considered doubtful whether the expert should be allowed to state what the cause of the abnormality was, for the reason that any one of a number of different causes, such as excitement or intentional disguising of the writing, or the

guiding of the hand by another, might produce the abnormal effect; and it is not easy to see what satisfactory means an expert has of differentiating between these possible causes. We think upon a new trial the evidence of the expert should be limited to the question whether the writing is or is not normal.

Another question arising upon the expert testimony is argued. The expert Tyrrell, on behalf of the state, had testified that the letter Exhibit L was evidently the work of an illiterate person (the defendant herself was such a person), and had given his reasons therefor. Upon the defense Miss Corkhill, a college graduate and experienced teacher, was called, and testified that in her judgment, after careful examination, Exhibit L was written by one who had a good high school education. She gave reasons for her opinion, and was interrogated further as to the distinguishing features of the letter, when the court interposed and stopped the examination on the ground that too much time was being taken. It is not easy to see why this ruling should have been made, but, as no exception was preserved, we cannot consider the question.

5. After evidence tending to show that the defendant lived in Milwaukee in the year 1889, and was then known as Lucy or Lucille La Blanc or La Blanche, the state offered in evidence a certified copy of the record of the conviction of one Lucy La Blanche for violation of one of the city ordinances of Milwaukee on November 18, 1889, and the reception of this evidence is assigned as error. While the defendant denied that she was in Milwaukee at that time and denied that she had ever been convicted, we think the evidence showing identity of name was sufficient to establish *prima facie* identity of the person and authorize the reception of the testimony as bearing on the question of her credibility under sec. 4073, Stats. 1898. The court properly charged that this testimony was only to be considered on the question of the de-

fendant's credibility as a witness, but in course of the charge said to the jury that there had been offered in evidence the record of the conviction of one Lucy *Colbert*. This statement is relied upon as reversible error by the defendant, because the record showed the conviction of Lucy La Blanche; but we are not inclined to regard it as serious, because it is so evidently a slip of the tongue that none could have been misled by it, and the jury were distinctly told that it was for them to determine whether the person so convicted was the defendant or not.

6. The defendant asked that the following instruction be given to the jury, and it was refused:

"All the evidence produced by the state is circumstantial. There is no direct or positive evidence that the defendant committed the crime charged. And to warrant a conviction on circumstantial evidence each fact necessary to the conclusion sought to be established must be proven by competent evidence beyond a reasonable doubt, and all the facts necessary to such conclusion must be consistent with each other and with the main fact sought to be proved, and the circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused, and no other person, committed the offense charged. The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to generate and justify full belief according to the standard rule of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable hypothesis. No other conclusion but that of the guilt of the accused must fairly and reasonably grow out of the evidence, but the facts must be absolutely incompatible with innocence, and incapable of explanation upon any other reasonable hypothesis than that of guilt."

The court gave the following instruction on the subject:

"You will have observed, gentlemen, on the prosecution of this case, that the evidence is largely, if not entirely, circum-

·stantial. Now, in respect to that I charge you that circum-
·stantial evidence is legal and competent in criminal cases.
If it is of such a character as to exclude every reasonable
hypothesis other than that the defendant is guilty, it is en-
titled to the same weight as direct evidence. If you believe
from the evidence beyond a reasonable doubt that the defend-
ant deliberately and intentionally set fire to the building, as
·charged in the information, it matters not that such evidence
is circumstantial, or made up of facts and circumstances, pro-
vided you believe such facts and circumstances pointing to
her guilt to have been proven beyond a reasonable doubt by
the evidence."

The requested charge was substantially a correct statement
·of the law and should have been given, and its refusal is prej-
udicial error because it was not covered by the general charge.
*Kollock v. State,* 88 Wis. 663, 60 N. W. 817.

7. The court correctly charged the jury as follows:

"It is claimed in this case, gentlemen, that some of the wit-
nesses have testified falsely. If you find that any witness
has knowingly and wilfully testified falsely as to any mate-
rial fact, you may reject all of the testimony of such witness
·except such parts of the testimony as you may find to be cor-
roborated by other credible evidence, or by facts and circum-
·stances that may fairly be inferred therefrom."

Later in the charge, after giving certain propositions re-
lating to the alleged proof of conviction of the defendant in
Milwaukee, the court said:

"The same rule applies in other evidence, contradictory
·statements made by the defendant or any other witness on
the stand. If you find they have made statements contrary
to the truth, the rule which I just read to you comes into
play; that is, you may disregard the testimony of that wit-
ness *whom you find beyond a reasonable doubt to have sworn
falsely.* You may disregard that except as it may be cor-
roborated by other credible evidence—to have knowingly
sworn falsely."

This last clause is plainly erroneous, and must be consid-
·ered prejudicial, although a correct proposition on the same

subject had previously been given. The facts essential to the conclusion of guilt are the only facts necessary to be proven beyond a reasonable doubt. To say that, in order to wholly discredit a witness for the state, the jury must find *beyond a reasonable doubt* that he has wilfully sworn falsely, is to cast upon a defendant in a criminal case a heavier burden than he would have to bear in a civil suit.

8. At the request of the defendant the court charged the jury that considerable of the state's testimony consisted of alleged admissions made in casual conversations, and that such evidence was considered in the law very weak, owing to the liability of a misunderstanding or defective memory on the part of the witness, and that it should be considered with caution. The court then added to the instruction the following:

"This is true, gentlemen. What I have just read to you is the rule. But bear in mind that admissions may be very important and very weighty testimony. It is for you to determine the weight and value that shall be given to these admissions, and to all the testimony in fact which has been produced in this case."

Abstractly, this added clause is correct as far as it goes, but it gives no criterion to the jury from which they are to judge when an admission is important or weighty. In fairness to the defendant the court should have told the jury that an admission, in order to be important and weighty, must be clearly proven, and shown to have been made with some degree of deliberation, or words to that effect. While we might not reverse on this ground if it stood alone, we have noticed the point in passing, in order to guide the court upon a new trial.

9. The defendant asked for the submission to the jury of a long instruction on the subject of expert evidence and the weight thereof, taken bodily from one of the opinions of this court, and the request was refused. It is not deemed neces-

sary to insert the requested instruction here.   It was in the nature of a philosophical discussion, and was not fitted nor intended for the instruction of a jury, and we find no error in its rejection.

10. In one of the instructions the court referred (by inadvertence evidently) to the fire "which *was* set in the Dempsey building," and to the *"setting of the fire* in the Dempsey building."   Whether, under the circumstances and the language used just previously in the charge, this might be misleading and prejudicial, we find it unnecessary to decide. Such an implied assumption that some person set the fire should be avoided, and we assume that it will not occur again.

We have found no other points which require discussion. For the prejudicial errors hereinbefore considered there must be a new trial.

*By the Court.*—Judgment reversed, and action remanded for a new trial.