ANDERSON, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 30—December 13, 1907.*

*Criminal law and practice: Homicide: Trial: Admission of evidence: Voluntary statement of accused:* Res gestæ: *Duress: Evidence of accused at inquest: Admissibility: Manslaughter: Resisting an officer: Requested instructions: Circumstantial evidence: Appeal and error: Prejudicial error: Instructions to jury.*

1. In a criminal prosecution of one charged with murder it appeared, among other things, that after defendant had escaped from the place of the homicide he ran up a railroad ,track followed by railroad men until he was captured; that, while pursuing, one of the railroad men shouted to defendant to throw up his hands, conveying the impression that he had a weapon, whereas he really had none; that when the defendant stopped he threw up his hands and was seized roughly by the collar and seemed scared, and said: "Don't hurt me;" that he was then asked: "Don't you know that you killed a bartender down here?" *Held*, that it was not error to permit a witness to testify that defendant replied he was sorry he did. it, since there was no threat of any consequences to defendant if he did not confess, and no implied threat nor promise of benefit from confession could be inferred from the evidence.

[2. Whether such reply of defendant was part of the *res gestæ*, not decided.]

3. A statement is voluntary unless made under the influence of a threat or menace which inspires dread or alarm, or induced by artifice or a promise or inducement of some profit, benefit, or amelioration of punishment.

4. In a criminal prosecution for murder it appeared, among other things, that the accused was present at an inquest, made no objection to his examination in general, and, although not expressly cautioned that he was not compelled to testify, declined to answer a number of questions put to him touching the homicide, and thereafter no attempt was made to compel him to answer those questions. *Held*, that his answers were admissible against him on the trial.

5. In a criminal prosecution for murder it appeared, among other things, that an officer had told the accused he was about to arrest him for carrying concealed weapons, although the officer

had not seen a weapon, and, the officer having signified an intention to search, the accused drew a revolver, whereupon the homicide took place during a scuffle for its possession. The accused testified: "The scuffle was not to resist any search or anything of that kind; that scuffle was for the possession of the revolver." *Held*, that by his own acts the accused had convicted himself of going armed with a concealed and dangerous weapon to the personal knowledge of the officer, contrary to the provisions of sec. 4397, Stats. (1898), and was liable to arrest therefor without a warrant; that the homicide did not come within the provisions of sec. 4351 (denouncing as manslaughter a homicide while unnecessarily and without malice resisting an unlawful act), and hence it was not error to refuse requested instructions defining the accused's rights and liabilities while engaged in such resistance.

6. In a criminal prosecution instructions as to circumstantial evidence are only applicable where, in order to convict, such evidence is relied upon either wholly or substantially; and in a case where the evidence was almost wholly that of eye-witnesses, it is not error to refuse a substantially correct instruction on that subject.

7. In a criminal prosecution for homicide an instruction that the law presumes that a reasonable person intends all the natural, probable, and usual consequences of his act, that when one person assaults another violently with a dangerous weapon likely to kill, not in self-defense and not in sudden heat of passion caused by provocation apparently sufficient to make passion irresistible or involuntary, and the life of the person thus assaulted is actually taken in consequence of such assault, then the legal and natural presumption is that death or great bodily harm was intended, and in such case the law implies malice, and such killing is murder,—is not prejudicial where it appeared that there was no evidence that the homicide was in self-defense, the accused testified to absence of passion or anger, and the conviction was of murder in the second degree, thus acquitting the accused of any premeditated design to kill.

8. In a criminal prosecution for homicide instructions to the jury on the subject of self-defense, stated in the opinion, are *held* to have been too favorable to the defendant because they gave the jury liberty to acquit him on a ground not justified by the evidence.

9. In such case no error prejudicial to the defendant could be predicated upon failure to make the instructions still more favorable on that subject.

10. In a criminal prosecution for homicide, instructions bearing on the conduct of the defendant, stating that the carrying of concealed weapons was a misdemeanor, and referring to the testimony in the case, stated in the opinion, are *held* to be without error.

11. An instruction in a criminal prosecution for homicide: "If there was a design to effect death on the part of the defendant, the case does not fall within this or any degree of manslaughter," in explaining manslaughter in the first degree, is strictly right and not erroneous.

12. In a criminal prosecution an instruction informing the jury of the weight which ought to attach to the defendant's testimony, immediately following instructions to the effect that the testimony of any witness who had wilfully testified falsely to any material fact might be wholly disregarded, is *held* free from any well-grounded claim of error.

Error to review a judgment of the circuit court for. Jackson county: James O'Neill, Circuit Judge. *Affirmed.*

The plaintiff in error, hereinafter called the defendant, was charged with the deliberate murder of one Jepson at the village of Merrillan, Jackson county, August 9, 1904, and upon his trial was convicted of murder in the second degree, and brings his writ of error to reverse the judgment.

The evidence showed that the defendant, an unmarried man about twenty-two years of age, and one Davis came to Merrillan from Elroy on Monday, August 7, 1904, in a box car without paying their fare. Merrillan is a village of some 700 or 800 population, and is the junction point of the Chicago, St. Paul, Minneapolis & Omaha and the Green Bay & Western Railways, and had at the time in question three saloons within its limits. Some ten or twelve passenger trains a day passed through the village. The defendant when he reached the village had in his possession two revolvers, a number of razors, a quantity of spectacles, and some cheap jewelry, all of which he alleged had been given to him by his comrade, Davis. On Monday, August 8th, he went about town attempting to sell some of these articles at the saloons

and other places of business, and succeeded in selling some small things, and obtained thereby some money with which he purchased drinks at the various saloons.    One Owen, a man of about seventy years of age, was marshal of the village and had his attention directed to the defendant and Davis as suspicious characters early in the day, and as a result of his suspicions he kept track of their whereabouts during the day, and at several times had conversation with the defendant. At about 3 o'clock in the afternoon Owen, having been told that the defendant had some revolvers on his person, came into the saloon of one Bone and found the defendant there drinking beer, no one else being at that time present except the barkeeper, Jepson.    There is testimony to the effect that prior to this time the defendant had been told to look out for the marshal, as he might nab him for peddling without a license, and the defendant said "he would like to see that white-haired s— of a b— take him," but this threat was denied by the defendant.    The tragedy occurred in Bone's saloon within a few moments after Owen entered it.    Only two witnesses were sworn as to the immediate cause and the circumstances attending the beginning of the difficulties, to wit, Owen and the defendant.    Owen testified substantially: That as he went into the saloon the defendant put something into his pocket which shone brightly, but he could not tell whether it was a revolver or a bottle.    That he, Owen, walked around in front of the defendant, who kept turning away from him, and said: "What are you following me for?" That Owen replied: "I don't know.    I have a right to go around, haven't I?"    And the defendant said: "I suppose so."    That Jepson, the bartender, had stepped into a back room, and Owen went to the door of the room and asked Jepson what the defendant had in his pocket.    That then Owen walked up to the defendant and said: "Come, take a walk down town with me.    I want to talk to you."    That the defendant refused, and then Owen said: "I will have to put

you under arrest," and the defendant asked what for, to which Owen replied: "For carrying concealed weapons, and on suspicion." That the defendant then stepped back and Owen took hold of his arm, and the defendant pulled out a revolver and pointed it at him, when Owen called: "Help, help!" That Jepson then came out of the back room, caught hold of the defendant very quickly, and the three had a squabble, Jepson seizing the defendant's right arm and Owen his left arm, and presently Owen heard the revolver go off, after which Jepson got the revolver out of the defendant's hand, and it dropped on the floor, and Jepson said: "I am shot, I see the blood;" and soon fell over. That the defendant then got away from Owen, ran out of the door and up the railway track, where he was soon caught by some railway men.

The defendant testified that while Jepson was gone in the back room Owen came in, walked up to him, and attempted to look in his coat pocket, and he asked what was wanted, and Owen said: "What have you in your pocket?" and defendant replied: "That concerns me," and Owen said: "Come and take a walk down town," and defendant said: "What for?" Owen said: "There is a woman down town wants to see you," and defendant said: "If there is any woman wants to see me, I think I will go with you," and asked who she was. Owen said: "It is your wife." And defendant said: "I don't think I will go." Owen then said: "Well, I will have to search you," and defendant said: "Have you a warrant?" and Owen said he had not, and defendant said: "You can't search me without a warrant." Owen said: "I can, and I will," and he attempted to lay his hands on defendant, who said: "Stand back, and let me alone," but Owen kept coming towards him, whereupon the defendant drew the revolver, supposing it was unloaded, and pointed it at the marshal just to frighten him; that Owen did not tell defendant that he put him under arrest or say anything of that kind, and told him that he

wanted to search him; but after he drew the revolver Owen turned pale and began to shake, and the defendant became frightened at Owen's condition and dropped his hand with the revolver to his side, and while he stood there staring at Owen with his arm at his side Jepson caught him by the neck and right wrist from behind and Owen caught hold of his other arm, and he told them to let him alone, he would give up, but that Jepson got around in front of him and got hold of the revolver and attempted to take it from him; that he had had but little experience with firearms; that he did not intend to shoot either Jepson or Owen, and that if he pulled the trigger he did not do so intentionally; that he could not say how the revolver was discharged, but that it was by reason of Jepson's attempt to take it from him; that he did not know whether at the time of the discharge his finger was or was not on the trigger; that he did not discharge it voluntarily; that he was not in passion or in anger, but he was excited; that he broke away from Owen and ran out because he was terrified; that if his finger pulled the trigger it was through some act of Jepson in pulling the defendant away or in pushing his finger.  Shortly after the struggle began one Sample came into the saloon through the rear door and saw the latter part of the struggle but took no part in it.  He testified, in effect, that he saw the revolver in the defendant's right hand during the scuffle; that most of the time it was pointed in the general direction of Jepson, and that when the shot was fired it was about fifteen inches from Jepson's breast.  After the defendant escaped from Owen and ran up the railroad tracks he was followed and captured by one Fowler, a freight conductor, and a number of other railway men.  Jepson died within a few moments after the shot was fired, without having made any statement.

Upon the same evening an inquest was held before a justice of the peace, and the defendant was taken to the inquest by the sheriff and testified.  Some of this testimony so given

was introduced upon the trial of the present case as tending to contradict some of his evidence given upon the trial. Under the charge of the court the jury was permitted to find the defendant guilty of murder in the first or second degree or of manslaughter in the first, third, or fourth degree, and was also permitted to acquit the defendant on the ground of justifiable or excusable homicide. Fifteen instructions requested by the defendant were given by the court, and twenty-nine instructions so requested were refused and due exception taken.

For the plaintiff in error there were briefs by *George M. Popham* and *Charles F. Hille,* and oral argument by *Mr. Popham.*

For the defendant in error there was a brief by the *Attorney General* and *F. T. Tucker,* second assistant attorney general, and oral argument by *Mr. Tucker.*

WINSLOW, J. The defendant assigns twenty-nine errors and discusses them in his brief under thirty-seven different heads. Many of these alleged errors are variations of the same proposition. Others are so closely related that they may be discussed as a class, while still others are not considered of importance enough to warrant individual treatment. All, however, have been carefully examined, and it is not to be assumed that those which are not specifically discussed have failed to receive due consideration.

1. After the defendant had escaped from Owen at the saloon he ran up the railroad track pursued by Fowler and other railroad men for about eighty rods, until he was captured. While pursuing the defendant Fowler shouted to him to throw up his hands, conveying the impression that he (Fowler) had a weapon, whereas he really had none. When the defendant stopped he threw up his hands and Fowler seized him roughly by the collar, and defendant seemed scared and said: "Don't hurt me." Fowler then

said: "G—— d—— you, don't you know that you killed a bartender down here?" At this point Fowler was asked what the defendant said in reply, and objection was made to the question because it appeared that the defendant was then in fear, and that his statement, if he made any, was not voluntary, but extorted by violence. The objection was overruled, the court remarking that this was all a part of the *res gestæ*, and the witness answered that defendant said he was sorry he did it. This ruling is alleged as error, but we have been unable to so regard it. Whether the trial judge was right in holding the statement to be a part of the *res gestæ* is not necessary to be decided. Any statement voluntarily made by the defendant with reference to his part in the transaction was admissible in evidence against him. A statement is voluntary unless made under the influence of a threat or menace which inspires dread or alarm, or induced by artifice or by a promise or inducement of some profit, benefit, or amelioration of punishment. *Hintz v. State*, 125 Wis. 405, 104 N. W. 110. Neither a menace, an artifice, nor an inducement appears here. The question was asked roughly, but there was no threat of any consequences if defendant did not confess, nor do we think any such threat can reasonably be implied, and certainly no promise of benefit from confession can be inferred.

2. An inquest was held before a justice of the peace on the evening of the tragedy, and the defendant (who was then in the custody of the sheriff) was taken before the magistrate and testified as to his recollection of the occurrence. Some of his answers did not agree with his statements upon the trial, and he was cross-examined under objection as to his testimony upon the inquest, and, his answers being unsatisfactory, the stenographer who took down the evidence upon the inquest was called in rebuttal, and allowed, against objection, to state what the defendant testified to upon the inquest upon these points. These rulings are assigned as error, on

the ground that the statements given by the defendant at the inquest while he was under arrest for the crime were not voluntary statements, but were made in ignorance of his rights, and hence were inadmissible. It appears that the defendant made no objections to the examination in general at the inquest. He was asked by the district attorney, "You understand what this proceeding is, do you not?" To which he answered: "I understand that it is some sort of a court; that is all I understand about it. I was sworn, that is all I understand about it." The district attorney then said: "And you do not understand anything else about it?" to which defendant answered, "No, sir," and the district attorney said: "I will state to you that this is an examination." The defendant said, "All right, sir;" and the district attorney continued: "To investigate as to the cause of the death of a man who was shot here today. The purpose is to make a final examination of the matter." Subsequently the district attorney asked him: "You understand what your rights and privileges are in an examination or trial?" To which the defendant answered: "I do not." No express caution was given to the defendant, nor was he informed that he was not compelled to testify, but it appears by the examination that he declined to answer quite a number of questions which were asked him on the ground that he preferred not to say anything on the particular subject inquired about, and that when he did so decline no attempt was made to compel him to answer. These facts seem to demonstrate quite satisfactorily that he knew he could decline to answer if he chose, and that no effort was made to compel him to answer when he exercised his privilege. There are undoubtedly authorities which hold, in substance, that the statements of an accused person made under oath at a coroner's inquest, when he had not been informed of his rights, cannot be introduced in evidence against him, but such is certainly not the rule in this state. In *Dickerson v. State,* 48 Wis. 288, 4 N. W. 321, it was

held that the statements of an accused person under arrest, made upon the preliminary examination of another person charged with the same crime, were admissible against him on his trial, there being nothing to show that his testimony was not entirely voluntary. The situation in that case was practically identical in its material features with the situation in the case at bar; and the case must be held as controlling. See, also, *State v. Glass,* 50 Wis. 218, 6 N. W. 500.

3. The principal contention made by defendant, however, is that under the evidence of the defendant the jury were entitled to find that at the time of the homicide the officer, Owen, and Jepson were attempting to make either an unlawful arrest or an unlawful search of the defendant without warrant, and that if such was the case they were guilty of an unlawful act within the meaning of sec. 4351, Stats. (1898)— *i. e.* an assault and battery; and if the defendant unnecessarily and without malice killed the deceased in resisting such assault and battery he was guilty of some degree of manslaughter, and was entitled to have the jury fully instructed as to his rights and liabilities while engaged in such resistance. By far the larger part of the twenty-nine instructions requested by the defendant and refused by the court were directed to this supposed phase of the evidence. They were based on the assumption that there was evidence in the case from which it might be properly found that Owen and Jepson were engaged either in an unlawful arrest without warrant or an unlawful search at the time of the shooting. They went largely into the question of the right of a peace officer to arrest a man without warrant for carrying concealed weapons when the officer has not himself seen the weapon; also the question of the inviolability of the person from search without warrant, and the question of the extent to which lawful resistance to such arrest or search may go, and what lower degrees of homicide may result from such resistance if carried to unwarranted extremes.

The arguments in support of these various propositions are able and ingenious and marked by much industry and ability. In our judgment, however, we are not required to discuss these very interesting questions. As we view the evidence the jury would not have been justified in finding that the shot was fired in resisting an illegal arrest or an illegal search. It is true that Owen testified that when he went into the saloon and saw the defendant he told him that he was about to arrest him for carrying concealed weapons and on suspicion, and the defendant testified that Owen did not say this, but told him he was about to search him. It may be conceded, for the purposes of the present discussion only, that he had no lawful right to do either without a warrant, although it must not be understood that we intimate any decision of that kind. If, however, before the shot was fired, the attempt to arrest, if such it was, had become lawful, or the attempt to search, if such it was, had ceased to the knowledge of the defendant, and the ensuing struggle had become simply a struggle for the possession of the pistol, then there was no foundation for the instructions on the subject of unlawful arrests and searches to rest upon. The undisputed evidence shows that after Owen's threat the defendant immediately drew his pistol and leveled it at Owen, and Owen in alarm retreated a step or two and stood there calling for help, while the defendant dropped his arm with the pistol to his side. At this time the defendant had convicted himself of the offense of going armed with a concealed and dangerous weapon to the personal knowledge of the officer, contrary to the provision of sec. 4397, Stats. (1898). The weapon was in plain sight, just drawn from its concealment, and the officer had a right to arrest without warrant. It is the duty of a village marshal, under the statutes, "to arrest with or without process . . . every person found in such village . . . violating any law of the state." Sec. 884, Stats. (1898). The defendant was now so found, and if the marshal's fur-

ther proceedings were simply attempts to arrest the defendant they were lawful. But it is argued that there was evidence that the marshal's threat was to make an unlawful search, and that if such was the threat and such was the belief of the defendant he had a right to resist, and had the right to have the question whether he carried his resistance too far and unnecessarily killed Jepson submitted to the jury. But it is clear that the attempt to search, if any was made, had ceased, and that the defendant knew it. It is conceded that if any search was threatened it was a search for the concealed weapon, and that defendant knew that fact. When the weapon was produced, all reason for a search was at an end. This, however, would not be conclusive, for the defendant might still believe that a further search was threatened. Doubtless he was entitled to act upon his honest belief based upon reasonable ground of apprehension. No one knows what his belief was except himself, and he has made it clear. Several times during his testimony he refers to the struggle between himself and Jepson as a struggle for the possession of the revolver, but all uncertainty seems to be removed by the following questions and answers at folios 661 and 662 of the record:

"*Q.* And all through that scuffle there you kept that in mind, did you, that they couldn't arrest you without a warrant? *A.* That scuffle was *not to resist any search or anything of that kind;* that scuffle was for the possession of the revolver. *Q.* Well, it was the revolver all the time that you didn't want them to take away from you, was it? *A.* It was after the scuffle had begun to take place."

There are no facts in the case tending to contradict this testimony; on the other hand, the other evidence tends rather to corroborate it, so the question of a supposed illegal arrest or illegal search is eliminated from the case, and the proposed instructions based on either of these suppositions were rightly refused.

4. The defendant requested the giving of the following

instruction, which was refused, and error is assigned upon such ruling:

"The court instructs the jury that, to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proven by competent evidence beyond a reasonable doubt, and all the facts necessary to such conclusion must be consistent with each other and with the main fact sought to be proved, and the circumstances taken together must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no other person committed the offense charged. The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to generate and to justify full belief according to the standard rule of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable hypothesis. No other conclusion but that of guilt of the accused must fairly and reasonably grow out of the evidence, but the facts must be absolutely incompatible with innocence, incapable of explanation upon any other reasonable hypothesis than that of guilt."

This is substantially the instruction requested in the case of *Colbert v. State,* 125 Wis. 423, 104 N. W. 61, the refusal of which was held to be error. That case, however, was a case where a conviction was sought on circumstantial evidence alone, and such was also the case in *Kollock v. State,* 88 Wis. 663, 60 N. W. 817, where a similar ruling was made. The instruction is only applicable where, in order to convict, circumstantial evidence is relied upon either wholly or substantially. This is not such a case. The evidence here was almost wholly the evidence of eye-witnesses. The fact that the revolver was in the hands of the defendant when the shot was fired was undisputed. Sample testified directly that he saw the revolver both before and at the time the shot was fired, and that it was in defendant's right hand and pointed generally at Jepson. It is upon this direct evidence that the

verdict must have been largely based, and not upon indirect evidence of circumstances merely persuasive in their nature. The refusal to give the instruction was therefore plainly right.

5. The giving of the following instruction is assigned as error:

"On the question of design or intention you are instructed that the law presumes that a reasonable person intends all the natural, probable, and usual consequences of his act; that when one person assaults another violently with a dangerous weapon likely to kill, not in self-defense and not in sudden heat of passion caused by provocation apparently· sufficient to make passion irresistible or involuntary, and the life of the party thus assaulted is actually taken in consequence of such assault, then the legal and natural presumption is that death or great bodily harm was intended, and in such case the law implies malice, and such killing would be murder."

This instruction was approved as a correct statement of the law after mature consideration in the case of *Clifford v. State,* 58 Wis. 477, 17 N. W. 304, and we are unable to see why it was not applicable to the testimony in the present case. As we shall presently see, there was no evidence in the case on which the shooting could be justified on the ground of self-defense, and the defendant himself testified that he was not in passion or anger, and the instruction seems, therefore, to be strictly appropriate. Again, it is to be remembered that the jury found the defendant guilty only of murder in the second degree, thus acquitting him of any premeditated design to kill, and the instruction, therefore, could not have been prejudicial.

6. The court instructed the jury generally on the subject of self-defense, and in that connection gave the following instructions which were duly excepted to:

"The evidence tends to prove that the defendant knew that Owen was the village marshal, and that in Bone's saloon Owen informed the defendant that his purpose was to arrest him."

"The court may say that an ordinary arrest without the infliction of any violence, although it may restrain of liberty, is not the great personal injury mentioned in the statute."

"And you are further instructed that this is the case whether the marshal was strictly justified in making the arrest without a warrant or not. On this subject of self-defense you need not inquire into the technical rules which govern as to the right to arrest without warrant. Suppose the marshal under the law had no right to arrest the defendant without a warrant, that alone would not justify the defendant in killing either the marshal or one called to assist in making the arrest."

"In any case, whether the attempted arrest was legal or not, the killing cannot be justified unless the defendant has brought himself within the rules the court has given. The jury may consider the evidence, apply the law as the court has instructed, and determine whether, if the defendant shot and killed the deceased, he was justified. If the defendant was justified on the ground of self-defense he is entitled to an acquittal."

There was no error prejudicial to the defendant in the giving of these instructions, because there was no evidence in the case from which the jury could rightly find that the defendant was justified in shooting Jepson on the ground of self-defense. Our statute—sec. 4366, Stats. (1898)—provides, among other things, that a homicide is justifiable when committed in "resisting any attempt to murder such person or commit any felony upon him" or "when committed in the lawful defense of such person . . . when there shall be reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and there shall be reasonable cause for believing that there is imminent danger of such design being accomplished." On any aspect of the evidence there was here no design, either actual or apparent, to murder or do great bodily injury to the defendant or commit any other felony upon him, nor any reasonable ground to apprehend such a design, nor did the defendant in fact apprehend it, as the evidence already recited fully shows. The whole charge, therefore, on the subject of self-defense was

entirely too favorable to the defendant because it gave the jury liberty to acquit him on a ground which the evidence does not justify. There was therefore no prejudicial error in the charge in this respect. But it is insisted, further, that the first clause above quoted, which recites that the evidence "tends to prove" that Owen informed the defendant that his purpose was to arrest him, is erroneous because it does not also call to the attention of the jury the fact that defendant's evidence tends to prove that Owen only told defendant that he intended to search him. Inasmuch, however, as there was no room for a finding of justification on the ground of self-defense in the case, and the charge even as given was too favorable to the defendant, no error can logically be claimed from a failure to make it still more favorable on this subject.

7. The following instructions were severally excepted to, but we feel entirely justified in saying without discussion that we find no error in them as applied to the facts of the case:

"It will be important for the jury to consider all the testimony bearing on the conduct of defendant during the whole struggle to determine whether the revolver continued in the hand of the defendant until the shot was fired, *whether the defendant was continuing to point the revolver at the deceased after the latter got around in front of the defendant.*"

"It is a misdemeanor in this state to carry concealed weapons."

"If the defendant intentionally aimed a pistol at and towards the marshal, not in self-defense, the marshal simply attempting to arrest the defendant, who had no reason to believe that he was in danger of any personal injury, the defendant would be guilty of a misdemeanor."

"There is evidence in the case tending to prove that the defendant was committing the offense of carrying concealed weapons and also of unlawfully aiming or pointing a pistol, as these misdemeanors have been above explained."

"I think the defendant testified that he was not in passion or anger."

8. The giving of the following instruction while explaining manslaughter in the first degree is assigned as error:

"If there was a design to effect death on the part of the defendant, the case does not fall within this or any degree of manslaughter."

This contention is based upon the doctrine announced in the case of *Terrill v. State,* 95 Wis. 276, 70 N. W. 356, and is perhaps justified thereby, but that doctrine was expressly overruled in the case of *Perugi v. State,* 104 Wis. 230, 80 N. W. 593, which has since been followed. *Cupps v. State,* 120 Wis. 504, 542, 97 N. W. 210, 98 N. W. 546. The instruction therefore was strictly right.

9. Error is alleged because the court gave the following instruction:

"Under the law the defendant is a competent witness in his own behalf. He has given his testimony, and you are the judges of the weight which ought to be attached to it. He is directly interested in the result of the trial. In determining the weight to be given to his testimony it is proper for you to take such interest into consideration. *You are to give his testimony such weight as, under all the circumstances, you think it is entitled to.* You have the right to consider his situation, his interest in the result of the trial, the temptation that exists under the circumstances to testify falsely, and everything appearing in the case bearing upon his credibility, *and to give to his testimony just such weight as you think it entitled to—no more, no less.* His testimony is to be considered with all the other evidence in the case."

The contention here made is that the court should not have singled out the testimony of the defendant, but should have applied the considerations of interest to all the witnesses alike. The giving of such an instruction unattended by any instruction that considerations of interest, appearance, manner, etc., apply to the defendant in common with all witnesses, was severely criticised in the case of *Schutz v. State,* 125 Wis. 452, 104 N. W. 90, but the question was not de-

cided because not necessary in that case. In the present case it appears that the instructions immediately followed certain other instructions proposed by the defendant. In the first of these last-mentioned instructions the jury were charged that in determining the weight to be given to the testimony of the different witnesses they were to take into account their interest or want of interest in the case, their manner, the probability or improbability of their testimony, with all other circumstances before them which could aid in weighing their testimony; that the defendant had testified as a witness, and his testimony should be weighed as the testimony of any other witness; that his interest in the result, his manner, and the probability or improbability of his testimony should be considered. Following this came two brief instructions concerning the inadequacy of suspicion as proof of guilt and the importance of motive, and after these an instruction to the effect that the testimony of any witness who had wilfully testified falsely to any material fact might be wholly disregarded. The instruction complained of immediately followed this last-named instruction. We regard it as in sufficiently close connection with the general instructions applying the same rules to all witnesses as to be free from any well grounded claim of error. We see no ground for believing that the jury could have been misled. The jury were entitled to consider the fact that he had a far greater interest in the result of the trial than any other witness, and this, we think, is the utmost effect which the instruction complained of in the connection it was given could have had upon their minds.

Exceptions were also preserved to certain other instructions, to the effect that in weighing the defendant's testimony the jury might consider how far the defendant had contradicted himself by his testimony at the coroner's inquest, and might also consider his conduct in running up the railway track as bearing upon his guilt or innocence, but these seem

to us so manifestly proper that we deem it unnecessary to discuss them.

Some other exceptions were taken to sentences of the charge, and one to a remark made by the attorney for the state during the trial; but in them we have found no prejudicial error, and we deem them undeserving of special consideration.

The final contention made is that the verdict is unsupported by the evidence and is against the law and the evidence. The important legal considerations urged in support of this claim have already been fully considered and determined. Upon the questions of fact, after careful consideration of the record we entertain no doubt that there was sufficient evidence on which to base the verdict. Finally, we may say that the defendant seems to have had a careful and patient trial, that the trial judge accorded to him fully all his legal rights, and that the verdict seems to have been fully justified by the evidence.

*By the Court.*—Judgment affirmed.