[File No. Cr. 132.]

STATE OF NORTH DAKOTA, Respondent, v. GLADYS R. GIBSON, Appellant.

(284 N. W. 209.)

Opinion filed August 31, 1938. Rehearing denied February 20, 1939.

*Starke & Starke* and *Keohane & Kuhfeld,* for appellant.

*P. O. Sathre,* Attorney General, *Theo. Kellogg,* State's Attorney, and *H. A. Mackoff,* Assistant State's Attorney, for respondent.

PER CURIAM: The defendant was convicted of the crime of murder in the second degree, in the district court of Burleigh county upon a change of venue from Stark county, and sentenced to fifteen years' imprisonment in the penitentiary for the murder of her husband, Nathaniel Gibson. Sentence was pronounced June 29, 1935. On July 20, 1935, the defendant moved for a new trial. On July 26, 1935, the trial court entered an order denying such motion. Thereafter the defendant made a second motion for a new trial based upon all the grounds and assignments of error specified in the former motion and also upon certain additional specifications of error. The second motion was noticed to be heard on November 2, 1935. The trial court denied the second motion for a new trial on the ground that the motion came too late and that the court was without jurisdiction to entertain it. This appeal is taken from the judgment of conviction and from the said two orders denying the motions for a new trial.

The trial was quite extended. The transcript of the proceedings had upon the trial is contained in eight volumes aggregating more than twenty-three hundred pages. The facts as they are necessary for a consideration of the errors assigned will be stated in connection with the assignments to which they relate.

The errors assigned divide themselves into three main classes:

(1) Assignments predicated upon rulings in the admission or exclusion of evidence;

(2) Errors assigned upon instructions to the jury, given or refused;

(3) The sufficiency of the evidence to sustain the verdict.

Nathaniel Gibson, the then husband of the defendant, died at Dickinson, North Dakota, on December 5, 1933, as the result of his being

shot with a revolver. The wound from which he died was inflicted in the early morning of December 5th. At about 4 o'clock on the morning of that day the defendant called one Dr. Rogers in Dickinson on the telephone, saying to him: "Doctor, will you come over right away, something terrible has happened." The doctor went to the Gibson house immediately and arrived there about eight or ten minutes later. He then found Nathaniel Gibson lying on a bed in the bedroom occupied by him and the defendant, with a gun in his left hand and a bullet hole through his head. Nathaniel Gibson was unconscious and bleeding profusely. He died about one hour and forty minutes later, without regaining consciousness. On December 18th, 1934, the defendant was arrested and charged with the crime of murder.

The evidence in the case shows beyond all doubt that the shot which killed Nathaniel Gibson was either fired by the defendant or was self-inflicted. It is the claim of the state that the shot was fired by the defendant, and it is the claim of the defense that Nathaniel Gibson committed suicide. The decedent, Nathaniel Gibson, was a rural mail carrier residing in Dickinson. He was about thirty-seven years of age. He and the defendant were married in 1916 and had living with them two daughters, Edith, age seventeen, and Pearl, age fourteen. His income as rural mail carrier aggregated nearly $200 per month. In addition to his wife and two daughters there was residing with the Gibson family a maid, one Katherine Donis; one Donald Webster, a brother of the defendant; and one Billy Amos, a friend of the defendant's brother.

Nathaniel Gibson and the defendant's brother, Donald Webster, were members of the Dickinson Company of the National Guard.

After supper, on the evening of December 4, 1933, the defendant drove her husband and her brother Donald to the Armory where they were to attend a drill of the National Guard Company of which they were members. One Lillie, a mechanic who performed some work on one of the cars used by the decedent, Gibson, in carrying mail, testified that Gibson came that evening about 9:45 and got the car.

The defendant testified that Nathaniel Gibson came home a little after 1:00 A. M.; that he had some trouble with his car in the driveway; that she went out to see what the trouble was and found him to be intoxicated.; that he vomited in the car; that she tried to get him

into the house but couldn't and went to the house and got her brother Donald Webster to come and assist her. She testified that after he was taken into the house he was seated on the davenport in the living room and undressed; that there was vomit all over his clothes; that she laid the clothes on the floor in the bedroom; that there was no gun in the clothing removed from the decedent when he was undressed. After being undressed, Nathaniel Gibson was placed in bed and the defendant's brother went to his room in the basement. Defendant testified that she laid down on the bed beside Mr. Gibson; that she was up a number of times to attend to him when he vomited; that the odor from the vomit nauseated her and that shortly before 4 o'clock she went upstairs to the bathroom. Before going to the bathroom she looked into the room where her daughter Edith and the maid, Katherine Donis, were sleeping and that she then went into the room where her daughter Pearl was sleeping and talked with her; that she then went to the bathroom and was just coming downstairs when she heard the shot fired; that when she came into the room, she saw her husband lying in the bed with the gun in his left hand and blood coming from the wound in his head; that she thereupon called her brother and his friend Bill Amos and that thereafter she called the doctor; that same evening an inquest was held.

A few hours before the defendant was arrested on December 18, 1934, she signed a written statement to the effect that she had shot her husband. The admissibility of this statement is one of the strongly controverted questions in the case. There is also a conflict in the evidence,—a conflict between the testimony of the defendant and the testimony of the maid, Katherine Donis, as to the defendant's movements immediately before and where the defendant was at the time the shot was fired. These matters, however, will be referred to at greater length in the discussion of the particular assignments of error in connection with which they arise.

As said, defendant made two motions for a new trial. The first motion was made July 20, 1935, and on July 26, 1935, an order was entered denying that motion.

The second motion for a new trial was noticed to be heard on November 2, 1935. The trial court denied the second motion on the ground that it came too late and that the court was without jurisdiction to en-

tertain it. This ruling of the trial court was clearly correct. Under our laws an appeal from a judgment in a criminal action must be taken within three months after its rendition. Section 10,994, Comp. Laws 1913, as amended by chapter 217, Laws 1927. Our laws provide that an application for a new trial in a criminal action must be made "before the time for appeal has elapsed." Comp. Laws 1913, § 10,920. The precise question presented here was considered and determined by this court in State v. Hagen, 54 N. D. 136, 208 N. W. 947. In that case this court held: "The district court has no power to entertain a motion for a new trial made after the time for appeal has elapsed. An appeal from the judgment and a motion for a new trial are independent remedies, and the taking of an appeal does not extend the time within which the motion for the new trial must be made." (Syllabus, ¶ 2.)

In this case the judgment of conviction was entered June 29, 1935. The time in which to appeal from such judgment expired three months after its rendition. The second motion for a new trial was noticed to be heard on November 2, 1935, more than four months after the rendition of the judgment. Therefore, under our statutes the trial court was without power to entertain the second motion for a new trial. The statute as construed in State v. Hagen, supra, has received the tacit approval of succeeding legislative assemblies. No effort has been made to change the rule or to adopt a new one. This court has no power to substitute its judgment for that of the Legislature.

Error is predicated upon the admission in evidence of a written statement signed by the defendant which reads as follows: "I killed my husband to protect my oldest daughter. I am writing this with my own free will. No one ever helped me to do this."

It is the contention of the defendant that the statement was not voluntarily given; that the statement constituted a confession and that under the rule laid down by this court in State v. Kerns, 50 N. D. 927, 198 N. W. 698, it was incumbent upon the trial court to hear the evidence touching the voluntary character of this alleged confession out of the presence of the jury and to determine its admissibility. The trial court ruled that the statement was not a confession but an admission and submitted to the jury the question whether it was or was not voluntary.

The statement was an admission and not a confession. "A confession is an acknowledgment in express terms, by a party in a criminal case of his guilt of the crime charged, while an admission is a statement by the accused, direct or implied, of facts pertinent to the issue and tending, in connection with proof of other facts, to prove his guilt. In other words, an admission, as applied to criminal law, is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only to establish the ultimate fact of guilt." 2 Wharton, Criminal Evidence, 11th ed. p. 954, § 580.

The statement in question here was not an acknowledgement of guilt in express terms. Everything stated might be true and yet the defendant might not be guilty of any crime. If she had killed her husband while he was attempting to ravish his daughter, and the defendant then honestly and reasonably believed that her daughter was in real danger, and that it was necessary to kill the husband to prevent him from committing the felonious act, then the defendant would have committed no crime. And proof of these facts would not have conflicted with anything said in the written admission, but would have been wholly consistent therewith.

The defendant contends, however, that in any event the same rules apply to the admissibility of an admission as those which apply to the admissibility of a confession; that in a criminal case it is incumbent upon the state to show that an admission was made voluntarily and that this question must be determined by the court and may not be submitted to the jury.

There are authorities sustaining the rule for which defendant contends, but in our opinion the sounder reason supports the rule that an admission is admissible in evidence without regard to whether it is shown to have been made voluntarily, and it is for the jury to determine the evidentiary value thereof in light of all the facts and circumstances attendant upon the making thereof. It is true that in a sense a confession is one form of admission, but there are, nevertheless, certain fundamental distinctions between a confession and an admission. A confession is an intentional voluntary statement of a person accused of a crime specifically admitting his guilt. A plea of guilty is a judicial confession. "A confession is a voluntary admission or

declaration by a person of his agency or participation in a crime. It is an acknowledgment of guilt and not of incriminating facts." People v. Kircher, 309 Ill. 500, 141 N. E. 151.

"A confession is an acknowledgment in express terms, by a party in a criminal case, of his guilt of the crime charged, while an admission is a statement by the accused, direct or implied, of facts pertinent to the issue, and tending, in connection with proof of· other facts, to prove his guilt. In other words, an admission, as applied to criminal law, is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only to establish the ultimate fact of guilt. To the ·credibility of a. confession of guilt, it is necessary that there should be an animus confitendi, or intention to speak the truth as to the specific charge of guilt. Such intention, however, is not essential to attach credibility to admissions of particular facts, in themselves indifferent, but which go to make up a case on which guilt is assumed to rest." 2 Wharton, Criminal Evidence, 11th ed. § 580. Confessions are "only one species of admissions; and all other admissions than those which directly touch the fact of guilt are without the scope of the peculiar rules affecting the use of confessions." 2 Wigmore, Evidence, 2d ed. § 821. And "since a confession is merely one sort of an admission, *all admissions are usable against the accused in a criminal case* precisely as against a party in a civil case (§ 821); i. e., so long as they have satisfied the confessional rule, or fall without its scope, they are to be tested, like other admissions, by the ensuing principles common to all admissions." 2 Wigmore, Evidence, 2d ed. § 1050, p. 508. People v. Shannon, 203 Cal. 139, 263 P. 522; Lawrence v. State, 29 Ariz. 247, 240 P. 863; State v. Guie, 56 Mont. 485, 186 P. 329; Com. v. Dascalakis, 243 Mass. 519, 137 N. E. 879, 38 A.L.R. 113; Com. v. Gleason, 262 Mass. 185, 159 N. E. 518.

The admission was written by the defendant herself. It had been obtained from her by a person who claimed to be a detective, and had been employed by the state as such, and the defendant claimed that she wrote the admission at the dictation of such detective. The testimony showed fully the circumstances under which the written admission was given. The methods employed by the detective in his dealings with the defendant were by no means commendable. This did not render

the admission inadmissible in evidence, but was a matter for consideration in determining what weight should be given to it as evidence. The admission went to the jury together with the testimony of all the facts and circumstances tending to minimize or destroy its probative effect, and with instructions more favorable to the defendant than those to which she was entitled.

The trial court instructed the jury that in arriving at their verdict, they should take into consideration oral or written statements made by the defendant only provided: (1) They were satisfied from the evidence that the oral or written statements or admissions were in fact made; and (2) they were satisfied from the evidence that the same were made voluntarily, and (3) they were satisfied that the same were true.

The court further charged the jury that the state had the burden of proving that the alleged admissions had been made voluntarily. The court, also, charged: "So in this case if you find from the evidence that any statement or admission or purported confession or so-called confession or an actual confession, either written or oral, made by the defendant Gladys Gibson touching upon the circumstances surrounding the death of Nathaniel Gibson and tending to connect her with his alleged murder, if you find she made any such oral or written statements or admissions or purported confessions or actual confessions, were not her free and voluntary act but were induced or secured by threats, or force, or compulsion, or by putting her in fear, or by any offers or promises of reward or immunity, then you will totally disregard such statements, admissions or confessions thus secured."

The court further instructed the jury at some length as to what they might consider in determining whether the alleged admissions were made voluntarily or involuntarily; and at the close of such instructions the court said: "If you find that any of them, as so made, are not voluntary, then those you will discard and totally ignore and give them no weight or consideration in arriving at your verdict in this case." These instructions were more favorable than the defendant was entitled to have the court give on this subject. They directed the jury to wholly disregard any admission unless they first found that it had been made voluntarily.

The state also offered in evidence testimony tending to show that the

defendant, at a time subsequent to the written admission, during a conversation had with the state's attorney, admitted that she had killed her husband and also admitted that she had maintained illicit relations with Joe Donis. Under the court's instructions to the jury, these alleged oral admissions were also subject to the same test as that which the court directed should be applied to the written admissions. What has been said as regards the admissibility of the written admissions is equally applicable here. The testimony as regards the alleged oral admissions was admissible, and under the court's instructions, the jury was required to consider such admissions under limitations distinctly favorable to the defendant.

The state offered in evidence letters written by some of the persons who testified as witnesses for the defendant. It is contended that it was error to admit these letters in evidence. Letters on which particular stress is laid were written to the defendant by one Elnora Donis and one Mrs. McKenzie. One of them contained a warning to the defendant to watch out for certain parties, and especially to be careful so that the defendant and one Joe Donis were not found together. Appellant's counsel contend that they were not admissible for impeachment purposes because sufficient foundation had not been laid to show that the witnesses had made contradictory statements at some designated time and place, and that they were inadmissible to show bias because the witnesses had never denied bias in favor of the defendant. The admission of evidence to show interest and bias on the part of a witness rests upon a different theory from that upon which evidence is received to show contradictory statements. In order to show bias on the part of a witness a party is not required to show a denial of such bias. Even though a witness admits his bias or prejudice in favor of or against a party in a lawsuit, it is always competent to show acts or statements indicating the extent of the interest of the witness, and the fact that a witness goes to great pains in writing instructions and directions for the guidance of a party such as the witness did here, clearly has a bearing upon her credibility.

It is true a witness may not be impeached on a collateral matter. But it is generally recognized that the interest or bias of a witness in the particular case is not a collateral matter; but is, so far as that particular witness is concerned, a question directly involved in the

determination of the particular issues of fact to which the testimony of the witness relates.

Underhill (Underhill, Evidence, pp. 906, 907) says: "The bias of the witness and his interest in the event of the prosecution are not collateral, and may always be proved to enable the jury to estimate his credibility. They may be proved by his own testimony upon cross-examination, or by independent evidence, and while much latitude is allowed, the extent of such cross-examination rests very much in the sound discretion of the court. . . . The bias of the witness may be shown, either by independent testimony or by questions put to him upon his examination. He may be interrogated as to his sympathy for the prisoner, or as to his hostility towards him."

. In Wharton, Criminal Evidence (3 Wharton, Criminal Evidence, pp. 2225–2227) it is said: "It is competent, as tending to impeach him, to show the witness's bias, prejudice, hostility, or animus, and the extent and cause of it. Since such matters are recognized as not being collateral, any evidence showing bias, prejudice, or antagonism on the part of a witness toward the defendant, or the existence of a biasing influence, is competent, even, it is held, though it is hearsay evidence. The hostility of the witness may be shown by any competent evidence obtained through examination of the witness himself or through the testimony of other witnesses."

"It is competent to show the motives of a witness to impeach him. . . . Motive may include either the purpose of gratifying the witness's prejudice, bias, hostility, or friendship in favor of, or against, a party, or the purpose of serving his own interest, and may be shown by the proof of specific wrongful acts."

While bias and interest may be shown by cross-examination and if the witness denies the particular act or statement concerning which inquiry is made, evidence may be introduced to contradict him, this is but one of the modes of establishing such bias or prejudice.

Wigmore says that facts tending to establish bias of a witness in the particular case in which his testimony is offered "may be offered either by extrinsic testimony or by cross-examination, without discrimination against the former." 2 Wigmore, Evidence, 2d ed. § 948. Where it is sought to impeach a witness by showing former statements indicating bias or prejudice it seems entirely logical to require that inquiry

be made from the witness as to whether such statements were made and if they are admitted, then, of course, there is no need to offer testimony to show that the witness made the statements he admits that he made, but the general admission by a witness of ill will against, or friendship for, a party to an action does not bar further inquiry as to the extent of such bias or prejudice. The acts of the witness are frequently a more accurate gauge as to the character and extent of interest or bias than what the witenss may state while upon the witness stand.

There is a conflict in the authorities as to whether it is necessary to lay a foundation for introduction of ,proof of acts by a witness showing bias or prejudice or whether testimony of such facts may be offered in the first instance without laying a foundation upon cross-examination of the witness. The authorities in support of both rules are collected in a note in 16 A.L.R. commencing on page 984. In this case it is unnecessary to determine whether foundation must be laid. The letters in question here were admitted as a part of the cross-examination of the witnesses who wrote the letters and each of the letters contains statements showing clearly the friendship of the writer for the defendant and concern in her behalf as regards matters arising out of the death of her husband. The letters were properly admitted in evidence.

The defendant called two expert witnesses—Dr. Bell, and Dr. Heron. Dr. Bell is Director of the Department of Pathology in the College of Medicine in the University of Minnesota, and Dr. Heron is, and for a number of years has been, deputy coroner of Ramsey county, Minnesota. Neither of these doctors had examined the body of Nathaniel Gibson. There were exhibited to these doctors photographs of the deceased, showing the entrance and the exit of the bullet. They were permitted to testify, and did testify, as to the course of the bullet through the brain, according to the photographs, and as to the probable effect and consequences of the wound thus caused; as to whether there would be loss of all voluntary movement; whether it would be possible to place a gun in the hand of a person rendered unconscious by such a shot "so that three fingers would remain tightly clasped about the butt of the gun;" as to the reflex, whether there would or would not be tendency of the fingers of a person so injured to grasp an object that was in his hand at the time the wound was inflicted or

one that was subsequently placed there; as to the different actions that likely would occur as regards the grasping and holding on to the pistol in case the injury were deliberately self-inflicted and where the injury were inflicted by another. Objections were sustained, however, to certain hypothetical questions propounded by defendant's counsel to these doctors, and error is predicated upon such rulings. As said, there were exhibited to the doctors, photographs of the deceased, showing the entrance and exit of the bullet.

Hypothetical questions were propounded to the doctors embodying a description of the wound, the position in which the body was found after the shooting occurred, and inquiry was made as to where, and in what position, the arm holding the gun would drop if the wound were self-inflicted. Other questions were propounded reciting the facts as regards the position in which Nathaniel Gibson's body lay when Dr. Rogers and the sheriff came, and based upon the facts stated, the doctors were asked to give their opinion whether the wound was self-inflicted or was inflicted by some other person. While the evidence showed that the doctors had a great deal of experience in the matter of gunshot wounds, there was nothing to show their expert knowledge of firearms. Many of the questions went far beyond an inquiry where the special training and qualifications of a physician and surgeon would qualify a person to speak as an expert. The obvious and immediate object of the questions was to obtain the opinion of the witness on the ultimate question whether the deceased had committed suicide. That is to say, the questions asked for the opinion of the expert on the ultimate question which was for the determination of the jury. Among the questions propounded to Dr. Bell, to which objections were sustained, and upon which error is predicated, are the following:

1. Q. "So that the holding of the gun would, in your opinion, Doctor, indicate a self-inflicted wound, would it not?"

2. Q. "Now, from what experience that you have had, Doctor, could you tell us in what position the hand would fall, assuming a self-infliction of the kind shown on Exhibits 3 and 4?"

3. Q. "Well, will you explain, Doctor, what you did expect to find if a person was shot and wounded in the manner shown by these pictures, Exhibits 3 and 4, where the wound by the shooting was not self-inflicted?"

While expert testimony is admissible, for the enlightenment of the jury and to enable the jury to decide questions of fact, it is not permitted to have experts decide the ultimate question of fact in the case for the jury. There are certain very definite limitations upon expert testimony.

Jones says: "Since expert testimony is an exception to the general rule of law excluding opinions from evidence, and trenches upon the province of the jury, it is not to be extended beyond the necessities of the case. The determination of the matters directly in issue is not thereby to be taken from the jury. Hence, the ordinary rule is that opinions of experts upon the merits, or upon the very matter to be tried, are inadmissible. All questions calling for expert opinions should be so framed as not to call upon the witness to determine controverted questions of fact, or to pass upon the preponderance of evidence. When the question is so framed as to call upon an expert witness, or any other, to determine on which side the evidence preponderates or to reconcile conflicting statements, he is, in effect, asked to decide the merits of the case, a duty wholly beyond his province. Whatever liberality may be allowed in calling for the opinions of experts, such witnesses must not be permitted to usurp the province of the court and jury by drawing those conclusions of law or fact upon which the decision of the case depends. Although this has been earnestly criticized, it is sustained by the undoubted weight of authority. It is, moreover, founded in practical necessity as well as theory; for in many cases trials would become farcical if zealous experts were allowed to express direct opinions upon the very issue to be tried." Jones, Commentaries, Evidence, Vol. 3, 2d ed. pp. 1321, 1322.

In Underhill, Criminal Evidence, 4th ed. § 234, it is said: "Conclusions of law or of fact upon which the decision of the case depends are not permissible to be drawn in evidence by expert witnesses, as, for example, that a wound was either accidentally or purposely inflicted, that it was not accidental, that accused could have been shot by the deceased, that deceased could not have fired the fatal shot, that it was impossible for the prosecuting party to have fired the first shot, the relative positions of the parties in a homicide. . . . Expert testimony which is merely argumentative is not admissible."

We find no prejudicial error in the rulings made in the examination of the medical experts.

The defendant testified before the coroner's jury at the inquest. Her testimony was taken down in shorthand. The reporter who took the testimony was called and testified regarding certain statements made by the defendant in her testimony at the coroner's inquest. It is contended by the appellant that this testimony was inadmissible, and that its admission violated the provisions of § 13. of the North Dakota Constitution which provides that no person shall "be compelled in any criminal case to be a witness against himself." N. D. Const. § 13.

The admission of testimony as to the statements made by the defendant at the coroner's inquest was not violative of the constitutional rights of the defendant.

"The constitutional right of defendant not to be compelled to be a witness against himself is not violated by the introduction in evidence of his testimony, voluntarily given, on a former trial for the same offense, or in another court, or at the coroner's inquest, or at the preliminary hearing, or before the grand jury, or at an extrajudicial investigation, or at a preliminary examination or trial for another offense." 16 C. J. 569.

The reporter who took the shorthand notes of the testimony of the defendant at the coroner's inquest used his notes to refresh his memory. He testified that he had correctly transcribed the notes and he produced what he testified to be a complete, true, and correct transcript of the notes of the testimony given by the defendant at the inquest. On cross-examination defendant's counsel offered the entire transcript in evidence and it was so received.

The testimony given by the defendant at the coroner's inquest did not constitute a confession. There were no statements made by the defendant in such testimony to the effect that she shot her husband or was in any manner responsible for such shooting. As regards this particular act her testimony was all to the effect that her husband had shot himself and that the wound from which he died was self-inflicted. It is true the record does not show that she was warned that any statements she then made might be used against her; but the record clearly negatives that any of her testimony was given as a result of intimidation, threats, force, or coercion. The statements made by the defend-

ant upon the coroner's inquest were voluntary within the meaning of the term. Anderson v. State, 133 Wis. 601, 114 N. W. 112.

Appellant cites a statement by Professor Wigmore to the effect that "voluntary testimony before a coroner's inquest . . . is . . . not a waiver for the main trial." 4 Wigmore, Evidence, 2d ed. § 2276.

This statement does not relate to the admissibility of statements made by a witness before a coroner's inquest. It relates to the extent of waiver of the privilege against self-incrimination by an accused who takes the witness stand.

The entire statement of Professor Wigmore is: "The waiver involved in the accused's taking the stand is limited to the particular proceeding in which he thus volunteers testimony. His voluntary testimony before a coroner's inquest, or a grand jury, or other preliminary and separate proceeding, e.g., in bankruptcy, is therefore not a waiver for the main trial; . . ."

In a note following the statement it is said:

(Note 5) *"But of course his voluntary testimony on the former occasion may itself be used* (subject to the rule for confessions, § 852) *on the subsequent occasion."* 4 Wigmore, Evidence, 2d ed. p. 920.

In other words, the rule as stated by Professor Wigmore is to the effect that a party who appears and testifies at the coroner's inquest does not thereby render himself subject to be called as a witness upon a subsequent trial of a criminal action involving the death of the person upon whose body the inquest was held; but that testimony given by a witness at a coroner's inquest is subject to admission against the defendant in a criminal action the same as other statements made by such defendant. If such statements constitute a confession then, of course, foundation must be laid to bring them within the confessions-rule; but if they are admissions which do not constitute a confession, then they are admissible the same as other admissions made by the accused. 4 Wigmore, Evidence, 2d ed. § 2276 (5) and cases cited in note 8. State v. Kimes, 152 Iowa, 240, 132 N. W. 180; Roberts v. State, 89 Tex. Crim. Rep. 454, 231 S. W. 759; State v. Finch, 71 Kan. 793, 81 P. 494. See also State v. Burrell, 27 Mont. 282, 70 P. 982.

Error is, also, predicated on rulings made in the course of the examination of Katherine Donis as a witness for the state. Katherine Donis was the maid in the Gibson household. She was in the house the night

preceding, and on the morning of, Gibson's death. She testified, among other matters, as regards the actions of the defendant and her brother, Joe, before Gibson's death, as well as afterwards. She testified that Joe moved into the Gibson house two or three days after Gibson's death. She testified that before Gibson's death she had noticed certain signals given by lights to indicate when Mr. Gibson was away; that Mrs. Gibson would go upstairs and turn the lights on and off; and that after such signals had been given, Joe would sometimes come over to the Gibson house, and that other times the defendant would go over after him. She also testified that Mrs. Gibson used to go out riding with Joe "a lot." She testified that she went down to the post office with Mrs. Gibson; that she (the witness), would go in and get the mail and bring it out to the car and that at times the defendant would go into the postmaster's office, and that when the defendant came out to the car, she asked the witness not to tell Joe. There was objection by the defendant's counsel to the latter question on the ground that it was immaterial, that if it is an admission, it is an admission on a matter that is wholly immaterial and not connected with the claim of the defendant. The state's attorney stated: "It is on the theory of infidelity." Defendant's counsel then said: "Everything she did is not an admission. It must be inconsistent with the claim now made in order to be admissible as an admission." The objection was overruled, and the witness answered: "Yes, she would tell me not to tell Joe," and again: "She told me not to tell Mr. Gibson or Joe that she had been down to see Mr. Lenneville (the postmaster)." There was a motion to strike the answer as immaterial, which was denied. There was no exception to the remark of the state's attorney. Apparently, at that time, it did not occur to anyone that there was anything improper in the reasons stated by the state's attorney.

It was the theory of the state that motives for the murder were: (1) An illicit love affair between the defendant and Joe Donis, of which the deceased had knowledge and on account of which he had required Donis to leave his home; and (2) certain life insurance policies on the life of the deceased, payable to the defendant.

At the time the questions were propounded to the witness, Katherine Donis, there was nothing to indicate the nature of the particular statement the defendant had made to the witness, Katherine Donis, and

concerning which inquiry was made. The statement which the witness stated the defendant had made indicated a concern on the part of the defendant as regards any possible action on her part that would give rise to jealousy on the part of Joe Donis. The fact that she had this concern, even to the extent of desiring that nothing be said to Joe Donis about that she had gone into the office of the postmaster when she was at the post office for the mail, would have a tendency to corroborate the other testimony that had been offered as regards her relations with Joe Donis, and for that reason the trial court was correct in refusing to strike the answer. As said, at the trial no exception was taken to the statement of the state's attorney as to the purpose of the inquiry. After the answer had been given, it was apparent that the testimony was offered as tending to substantiate the claim that had been made as to the irregular or improper relations between the defendant and Joe Donis. The remark of the state's attorney was addressed to the court and not to the jury. It was in the nature of an explanation after defendant's counsel had made the objection.

We find no error in these rulings of the court. The only points on which the court's rulings were invoked were first as to the questions, and later by motion to strike the answer. It is possible that a more happy way of stating the object of the testimony might have been devised, but we must view the matter in the way the situation arose and as it existed at the time. The language used by this court in State v. McGahey, 3 N. D. 293, 55 N. W. 753, is quite applicable here: "Counsel must have some latitude and some discretion. In the heat of nisi prius trials, where questions are raised that must be instantly met, counsel cannot be expected to weigh with nicety and precision the effect of their words. This matter must, of necessity, rest largely in the discretion of the court, and abuse of that discretion is not to be rashly presumed. We are in full accord with the language of the learned supreme court of the state of Indiana, that 'when the statement is a general one, and of a character not likely to prejudice the cause of the accused in the minds of honest men of fair intelligence, the failure of the court to check counsel should not be deemed such an abuse of discretion as to require a reversal.' Combs v. State, 75 Ind. 215. And more emphatically would this be true where, as in this case, the remarks were addressed to the court, and were entirely pertinent

and proper for the court to hear; and, while in the presence of the jury, yet in no sense directed to them, or intended to influence them. No case cited by counsel would warrant us in sustaining his point." 3 N. D. 293, p. 306, 55 N. W. 753.

The defendant also assigns error upon the instructions to ·the jury given and refused. The respondent asserts that these assignments may not properly be considered on this appeal for the reason that the appellant did not file written exceptions to the instructions within twenty days after they were filed as provided by § 10,824, Comp. Laws 1913. In support of this contention respondent cites State v. Reilly, 25 N. D. 342, 141 N. W. 720; State v. Shoars, 59 N. D. 67, 228 N. W. 413; State v. Balliet, 61 N. D. 703, 240 N. W. 604; State v. Bossart, 61 N. D. 708, 240 N. W. 606; State v. Youman, 66 N. D. 204, 263 N. W. 477.

Appellant's counsel concede that ·the former decisions of this court support the contention of the respondent, but they argue that the rule is erroneous and not warranted by § 10,824, supra, when that section is construed together with §§ 10,825, 10,906 and 10,915. Appellant's counsel further contend that the rule established by the former decisions is predicated upon the holding in State v. Reilly, 25 N. D. 342, 141 N. W. 720, supra, and it is contended that the decision on that point in State v. Reilly was overruled on rehearing, and the holding in the original opinion on that point repudiated.

. The contention of the respondent must be sustained. The statutes relating to the charge of the court to a jury in a criminal case and the taking of exception thereto have remained in force without change since they were embodied in the Revised Codes of 1895.

The question whether it is essential to file written exceptions with the clerk of the district court was first considered in State v. Campbell, 7 N. D. 58, 72 N. W. 935. In that case written exceptions had been filed and the court held that the defendant was restricted to the exceptions thus filed and could not predicate error upon instructions which had not been challenged by such written exceptions. After so holding· the court said: "The exigency of the case at bar does not require this court to determine whether, in a case where no such exceptions to the charge are filed by counsel, an exception to each feature of the charge will presume to result under the statute and by operation of law." The

court then cites all the sections of the statute which are invoked by the parties to this action.

The question next arose in State v. Reilly, supra. The holding in the original opinion in that case is stated in ¶ 12 of the syllabus thus:

"The trial judge said:

"The court at this time will submit to the jury a written charge, but owing to the fact that there is but one counsel for the defense, and that his time has been thoroughly taken up during the progress of the trial so that he has not had proper and sufficient time to consider the charge in order to file his written exceptions thereto, which he would be required to do before the charge was given, the court will permit the defendant to consider the charge the same as if it had been delivered orally, and save to him his right to file exceptions thereto the same as if it were an oral charge. Held: that under §§ 9987, 9988, and 10,-078, Rev. Codes 1905, such exceptions were required by the order to be filed within twenty days, and that unless such exceptions were so filed the right thereto was waived."

A rehearing was ordered and in the opinion on such rehearing it was stated that it had been discovered that the trial judge had extended the time for filing exceptions to the charge, and said the court: "We must therefore on this rehearing overrule the ruling made in ¶ 12 of the syllabus and the statement in the main opinion upon which the same is based as the waiver if any has been excused by the trial court." It is clear that the word "overrule" was used inadvertently and that what the court meant was that that portion of the opinion was withdrawn because the question was not involved upon the record in the case. There was no intention to express any disapproval of what had been said in the original opinion but merely to indicate that the question was not involved and, hence, not decided. That there was no intention to disapprove of what had been said is apparent from the syllabus on the opinion on the petition for rehearing. The paragraph of the syllabus relating to the matter under consideration reads as follows: *"Although under §§ 9987, 9988 and 10,078, Rev. Codes 1905, exceptions to an oral charge are required to be filed within twenty days, and unless so filed the right thereto will be waived,* the omission will be deemed to have been cured where the record discloses that the court allowed an extension of time to settle the case on condition that excep-

tions to his charge be filed within a time limited, and that subsequently to such time the said court certified as a true and correct statement of the case, a statement which included the exceptions in question." 25 N. D. 342, 141 N. W. 720.

The decision in State v. Shoars, 59 N. D. 67, 228 N. W. 413, supra, did not rest upon the doctrine of stare decisis. The question of the meaning and effect of the statutes relating to the filing of exceptions to the court's instructions to the jury was considered as though it were an open one, and after a discussion of the meaning and effect of the statutes attention was called to what had been said in the Reilly Case.

The rule announced in the Shoars Case has subsequently been reaffirmed in State v. Balliet, 61 N. D. 703, 240 N. W. 604, supra, State v. Bossart, 61 N. D. 708, 240 N. W. 606, supra, and State v. Youman, 66 N. D. 204, 263 N. W. 477, supra.

In State v. Bossart, supra, this court said: "The record does not show affirmatively that the written charge was first submitted to counsel for examination as permitted by § 10,825 of the Compiled Laws, 1913. If so submitted and no exceptions taken and filed, we cannot consider the specification of error. If not first submitted to the counsel, it is in no better position for the state than an oral charge, and while an oral charge is deemed excepted to in order that the other party may have an opportunity to examine it after delivered and transcribed, yet these exceptions must be reduced to writing and filed within the time fixed by statute. Not having filed any such exceptions, the right thereto is waived. See State v. Shoars, 59 N. D. 67, 228 N. W. 413; State v. Reilly, 25 N. D. 342, 141 N. W. 720; State v. Balliet, 61 N. D. 703, 240 N. W. 604, just decided." State v. Bossart, 61 N. D. 708, 240 N. W. 606, 610.

This language applies here. In this case it appears that the charge was in writing. The record does not affirmatively show that it was submitted to counsel for examination. The record does show that no exceptions were taken at the time the charge was given or filed with the clerk of the district court within twenty days after it had been filed.

It is a matter of common knowledge that the settled practice in this state always has been to file written exceptions to the charge in criminal cases. And until the adoption of the Civil Practice Act in 1913

this was also the practice in all civil cases. That is, prior to the adoption of the Civil Practice Act of 1913 it was the established practice in all cases, both civil and criminal, where a written charge was not submitted to counsel and exceptions required to be taken before the charge was delivered to the jury, to file written exceptions in both civil and criminal cases. The practice act adopted in 1913 related only to civil actions and the practice which formerly prevailed in criminal cases remained unaffected, and that practice was in accordance with the construction which had been placed upon the statutes by this court in all cases where it has been required to pass upon the question.

The Shoars Case, 59 N. D. 67, 228 N. W. 413, was decided in January, 1930. Four legislative assemblies have since convened and there has been no attempt to change the rule that was announced in that decision. That rule is in harmony with the rule prevailing in practically all other jurisdictions. To attempt to depart from or change it by judicial interpretation would be, in effect, to enter into the field of legislation.

Appellant also contends that the verdict is against the law. This contention is predicated upon § 9459, Comp. Laws 1913, which reads as follows: "No person can be convicted of murder or manslaughter or of aiding suicide, unless the death of the person alleged to have been killed and the fact of the killing by the accused as alleged, are each established as independent facts; the former by direct proof and the latter beyond a reasonable doubt; but in no case upon a plea of not guilty, shall the confession or admission of the accused in writing or otherwise, be admissible to establish the death of the person alleged to have been killed."

It is argued that the corpus delicti consists of two elements: 1. The fact of death, and 2. That the death was produced through some criminal agency. It is the contention of the appellant that under the provisions of § 9459 supra, both elements must be established by direct proof, that it is not sufficient to establish the fact of death by direct proof, that there must also be direct proof that the death was produced by some criminal agency; and that under this statute the confession or admission of the accused is not admissible, and may not be considered, upon the question whether Nathaniel Gibson was killed by the defendant. This contention cannot be sustained. The statute draws a clear

distinction between the proof of death and proof that the death was produced through the criminal agency of the accused. It is only the fact of death that must be established by direct proof, and it is the fact of death that the statute says may not be established by the confession or admission of the accused. The reason for the rule embodied in the statute was stated at some length in State v. Sogge, 36 N. D. 262, 161 N. W. 1022. As there stated, the rule as announced by Lord Hale was that "the accused shall not be convicted unless the death be first distinctly proved, either by direct evidence of the fact, or by inspection of the body; a rule warranted by melancholy experience of the conviction and execution of supposed offenders, charged with the murder of persons who survived their alleged murderers."

The defendant also contends that the court erred in giving to the jury instructions relating to murder in the second degree. It is argued that under the evidence, the defendant, if guilty at all, was guilty of murder in the first degree, and that therefore it was error to submit any instructions relating to the murder in the second degree. The contention is without merit. If the defendant shot her husband, she was guilty of murder. It is inconceivable that the jury would find her guilty of murder in the second degree if they had reasonable doubt as to whether she fired the shot at all. The defendant was not prejudiced by the fact that the jury, if, after a consideration of the evidence, they were convinced beyond a reasonable doubt that she killed her husband as they must have been to return the verdict they did, were afforded an opportunity to and did bring in a verdict for the lesser degree.

Error is assigned upon certain statements made by the state's attorney in his argument to the jury. The statements to which exception is taken, related to some of the letters heretofore referred to, which were admitted for impeachment purposes. The letters referred to in the comment of the state's attorney had been written to the defendant by Elnora Donis, and had been introduced in evidence during her cross-examination. The testimony given by Elnora Donis in her examination in chief tended to impeach her sister, Katherine Donis, and also tended to impeach the witness Mrs. Donis, the mother of Elnora Donis, who, also, had testified as a witness for the prosecution. Elnora Donis, also, testified to certain statements which, she said, her mother had made, tending to show strong bias and ill-will on the part of her mother

toward the defendant. In the course of her cross-examination, Elnora Donis was asked whether she had ever observed any "conduct of indecency" between her brother, Joe, and the defendant. She answered in the negative. She was then asked if she had ever heard of such a thing, and likewise answered in the negative. But, on motion of counsel for the defendant, the answer was stricken out. She was then asked if she had made any statement to the defendant to the effect that she would not tell what she knew about the defendant and her brother, Joe. She answered in the negative. She was then asked whether she had corresponded with the defendant, and whether she had written her letters containing certain statements relating to the defendant and her brother, Joe. She answered in the negative. She was then shown one of the letters in question and asked if she had written it to the defendant. She answered in the affirmative. Counsel for the state then offered the letter in evidence. There was an objection by counsel for the defendant on the ground that the letter was immaterial; and explanatory of the objection, defendant's counsel stated ·that there was nothing in the letter "that would tend to impeach her" or "dispute" anything said by the witness on direct examination. The following colloquy then occurred:

"Mr. Mackoff (Assistant State's Attorney) : It shows interest.

"Mr. Eberhard (Counsel for defendant) : We object to it on the ground it is immaterial.

"Mr. Mackoff : It shows interest, affects the credibility.

"Mr. Eberhard : It doesn't affect the credibility.

"Mr. Mackoff : Disputes statements she made.

"The Court : That ·was the theory I was letting it in on, showing interest and affecting the credibility."

Subsequently, other letters were exhibited to the witness, which she admitted that she had written to the defendant.

The state's attorney, in his argument, stated that there had been an attempt to explain the relationship between the defendant and Joe Donis as being wholly proper, and the attitude of the defendant toward Joe as being wholly "motherly." He then referred to an incident that had been mentioned in the testimony adduced by the state, tending to show that the relationship was improper, and he also referred to the letter from the witness, Elnora Donis, to the defendant, and stated he

would read the letter. There was objection by the defendant's counsel to the reading of "excerpts from the letter," as part of the argument then presented, on the ground that the letter had been admitted for impeachment purposes only; the objection was overruled. The state's attorney proceeded with his argument and stated that the witness, Elnora Donis, had denied that she had observed any improper conduct between the defendant and her brother; and he then proceeded to read the letter.

In the letter the witness, among other things, asked the defendant to be careful and to tell Joe the same; that they were being watched and that some day a certain party would come to the defendant's place and find Joe in hiding. The state's attorney,—after again calling attention to the fact that Elnora Donis, on the witness stand, had denied all knowledge of any improper relations between the defendant and her brother, Joe,—stated that Elnora Donis had written another letter to the defendant, which the state's attorney started to read. There was similar objecion by the defendant's counsel as to the former letter. The objection was overruled, and the state's attorney read the letter. The letter indicated concern on the part of the writer, and rather a strong interest in behalf of the defendant, and made some references to what her sister, Katherine, had said as regards the defendant and her brother, Joe.

In so far as the argument of the state's attorney called to the attention of the jury the contradiction between the testimony of Elnora Donis upon the trial and the statements formerly made in her letters; and in so far as he called to the attention of the jury the bias and interest of Elnora Donis in favor of the defendant as evidenced by the statements in her letters; and in so far as he questioned the credibility of Elnora Donis and the weight to be given to her testimony, the argument was wholly proper. But, in so far as the argument might be construed as suggesting, or contending, that what Elnora Donis had said in her letter, or letters, might, or should be, considered as proof of the existence of the facts purported to be stated in her letters, it was not proper. There was no objection, or exception, to the argument that preceded, or that followed, the reading of the letters. The objection was to the state's attorney's "reading any excerpt from the letter" as evidence of any misconduct on the part of the defendant.

The letters were admissible, and had been admitted, in evidence only for the purpose of impeaching the testimony of Elnora Donis by showing her bias in favor of the defendant, and her statements in the letters contrary to her testimony on direct examination. To this extent, and in this sense, the letters would have a bearing on whether the alleged illicit relationship between the defendant and Joe Donis existed,—but they had a bearing only to the extent that they affected the credibility of Elnora Donis. The principal tenor and effect of the testimony of Elnora Donis as given in her examination-in-chief, was to impeach her sister, Katherine, and her mother. Elnora Donis testified that her sister, Katherine, in a conversation with her some time before the trial, had stated that the testimony which she (Katherine) gave at the inquest was true. Elnora testified also that her mother had ill-will toward the defendant, and she gave an instance evidencing intense ill-will. Both Katherine and the mother had given testimony tending to show an illicit relationship between the defendant and Joe Donis. In fact, the testimony of the mother was devoted almost wholly to this subject. So, in determining whether such relationship existed, the jury must, of course, determine what weight and credence to give to the testimony of Katherine Donis and her mother, and in making this determination, the jury was required to consider the testimony of Elnora Donis, inasmuch as such testimony tended to impeach the credibility of Katherine and her mother. And in determining the weight and credence to give to the testimony of Elnora Donis, the jury would have to consider not only the testimony which Elnora Donis had given in her examination-in-chief, but, also, the testimony she gave on her cross-examination, including the letters that had been received as a part of the cross-examination.

What is proper, and what is improper argument is frequently a matter on which there is room for diversity of opinion. It happens at times that in the course of an argument, statements and deductions are made that may be unsound, incorrect, and unwarranted. In the very nature of things, the trial judge must be, and is, vested with large discretionary powers in controlling the remarks of counsel. 16 C. J. 887. It does not follow that because erroneous, unwarranted, or even improper statements are made in the course of an argument in a criminal action, that the verdict must be set aside. That result can follow only where

the unwarranted or improper statements are such that it is likely that they prejudiced the cause of the accused and thus affected the verdict.

"The control of the remarks of counsel for the state during a criminal trial is a matter largely in the discretion of the trial court; and where the objectionable remarks are of a general character, and such as would not be likely, under the attending circumstances, to prejudice the cause of the accused in the minds of honest men of fair intelligence, the failure of the court to strike out such remarks, or caution the jury against them, is not such an abuse of discretion as will constitute error." (Syllabus ¶ 5) State v. McGahey, 3 N. D. 293, 55 N. W. 753.

It is not claimed in this case that there was a violation of any statutory limitations upon counsel,—such as the inhibition against comment on the failure of the defendant in a criminal action to testify.

"The objections are placed upon broader grounds, and, to support them, it must clearly appear that counsel have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the testimony. This rule was never intended to limit counsel in any manner that could injuriously affect his case upon the merits. He is allowed a wide latitude of speech, and must be protected therein. He has a right to be heard before the jury upon every question of fact in the case, and in such decorous manner as his judgment dictates. It is his duty to use all the convincing power of which he has command, and the weapons of wit and satire and of ridicule are all available to him so long as he keeps within the record. He may draw inferences, reject theories and hypotheses, impugn motives, and question credibility, subject only to the restriction that in so doing, he must not get clearly outside the record, and attempt to fortify his case by his own assertions of facts. . . . But this matter is, and of necessity must be, largely within the discretion of the trial court, and the action of the trial court should be reversed only in cases of clear and prejudicial abuse of this discretion." State v. Kent (State v. Pancoast) 5 N. D. 516, 559, 560, 67 N. W. 1052, 35 L.R.A. 518.

Our laws provide that: "After hearing the appeal, the court must give judgment without regard to technical errors or defects or exceptions which do not affect the substantial rights of the parties." Comp. Laws 1913, § 11,013.

The jury in this case heard the statements that were made by counsel and by the court at the time the letters were received in evidence. They heard what the court then said was the purpose for which they were admitted in evidence.

When the argument to which exception is taken is considered in light of all the facts and circumstances in the case, including the instructions of the court to the jury, we are of the mind that honest, intelligent jurors could not, and did not, as a result thereof, return a verdict which they otherwise would not have returned.

There remains one further question for consideration. It was urged upon the motion for a new trial, and is urged here that the evidence is insufficient to sustain the verdict. The members of this court, being fully aware of the extreme importance of this case, and of the responsibility which is placed upon them here, have given the most careful attention to the evidence in the case. The record is lengthy. The evidence which is presented literally in the transcript as it was given in the court room, has been read and reread. The members of the court have had the benefit of briefs and extended oral arguments. Owing to the nature of the case, the mass of testimony, and the difficult questions involved, no time limit was placed upon the oral arguments. Each member of the court has, for himself and upon his individual consideration of the facts, come to the conclusion that the evidence is wholly sufficient to sustain the verdict. That is, the members of the court are all agreed as to the legal sufficiency of the evidence and that there was, and is, substantial evidence in support of the verdict. The members of the court are all of the mind that the evidence is such that reasonable men, in the exercise of reason and judgment, in consideration of the facts and circumstances in this case, could intelligently and honestly reach the conclusion beyond a reasonable doubt that the defendant is guilty as found in the verdict. State v. Gummer, 51 N. D. 445, 200 N. W. 20.

There was introduced in evidence, not only the written admission of the defendant, but a subsequent oral admission to like effect, as well as an admission of her illicit relations with Joe Donis. While the written admission was obtained under circumstances that had a tendency to lessen its probative force, the subsequent oral admission, although given while the defendant was in custody, was given under cir-

cumstances where there can be no reasonable claim that it was obtained by inducement, threat, or force. But wholly aside from the admissions, there is evidence from which, in our opinion, reasonable men, in the exercise of reason and judgment, might honestly reach the conclusion beyond a reasonable doubt that the defendant killed her husband. There is ample evidence to warrant the conclusion that the defendant was, and for some time had been, infatuated with Joe Donis, and that illicit relations then existed, and had been existing between them for some time. There is evidence to the effect that almost a year before the death of Nathaniel Gibson, he had required Joe Donis to leave his home, and had forbidden him to come back or to stay there; that clandestine meetings between the defendant and Joe Donis continued, not only in the Gibson home during the absence of Mr. Gibson, but elsewhere; and that two or three days after the death of Gibson, Donis returned to the Gibson home and took up his residence there. It also appears from the evidence, that Nathaniel Gibson carried a substantial amount of life insurance with the policies payable to the defendant.

According to the testimony of the defendant, her husband returned home about 1 o'clock on the morning of his death in a very intoxicated condition; that she undressed him and placed him in bed; that he vomited continually. She testified that she lay down on the bed with him; that she became nauseated as a result of attending to him, and went upstairs to the bathroom; that before going, she kissed him; that she remained upstairs a few minutes; that the shot was fired as she was coming downstairs. That when she came into the bedroom, she noticed him lying on the bed with a gun in his left hand, bleeding from a wound in his head. (Testimony was adduced showing that the deceased was ambidextrous and handled a pistol well with his left hand.) She testified that almost immediately she called the doctor who came a few minutes later. The bed and the body had not been touched, and it is undisputed that the covers and pillows on the bed showed no evidence of anyone having occupied the bed besides the deceased. That same evening at the inquest, the defendant's story as to what occurred immediately before the shooting was corroborated among others, by Katherine Donis, the maid. On the trial of this case, however, Katherine Donis testified quite differently. She testified that she did not hear the shot; that the defendant came upstairs and wakened her and told

her that something terrible had happened,—that Mr. Gibson had been shot. Katherine Donis further testified that the defendant told her what testimony to give at the inquest. The inquest was held on the evening of the day that Gibson was shot. At such inquest the defendant stated that only about a week before, her husband one night started to get out of bed, declaring that he intended to go upstairs and get in bed with his older daughter and the maid, for the purpose of having sexual intercourse with his daughter. She also related other instances of sexual aberrations and irregularities of her deceased husband.

It is the claim of the defendant that the deceased committed suicide. It is contended that the physical facts, such as the manner in which the gun was held in the hand of the deceased, and the position in which the hand and arm were found, all indicate suicide. A consideration of all the evidence, including the testimony of the medical experts who testified for the state, does not, in our opinion, establish any such condition. If the body had been found as it was, without any other proof, it would not have established either that the death was a result of a self-inflicted wound or a wound inflicted by someone else. As bearing upon the question of suicide, evidence was adduced that tended to show that owing to financial difficulties, the deceased had been compelled to go through bankruptcy some time before; that he was very concerned about this; that he did not want to go through bankruptcy and that from that time on he was very depressed; that a postal inspector had called to see him, apparently in regard to some complaint against him; that for some time the deceased had devoted most of his spare time to reading certain religious tracts and booklets written by one Judge Rutherford. Many of these tracts and booklets were offered in evidence. These tracts and booklets embody the teachings of, and are circulated by, the sect known as "Jehovah's Witnesses." The defendant testified, and other witnesses called in her behalf likewise testified, that the deceased for a number of months prior to his death had been taciturn, and morose; that he no longer went to church; that he did not participate as formerly in conversation and activities in the home, but devoted himself largely to the reading of the religious booklets already mentioned. There was also evidence adduced by the defendant, showing that the deceased, only a relatively short time before his death, prepared some small booklets containing unspeakably lewd and indecent caricatures.

It seems rather strange, if the deceased was so impressed with the religious teachings contained in the booklets that were offered in evidence, and was pondering upon religious questions, was depressed over the fact that he had been unable to pay his creditors, that he should at the same time be engaged in drawing the lewd caricatures, which, so far as the evidence discloses, he never exhibited to anyone; but which testimony adduced by the defendant tended to show he had drawn during the same time, that it is said he was spending a greater portion of his spare time in reading religious tracts. It is also strange that during this time he should express, and actually take steps to satisfy, an unnatural desire to have sexual relations with his own daughter, and that he should discuss this fact with his wife. All of these acts are wholly inconsistent with the religious teachings which, it is said, had so seriously impressed him. Nor has anything been pointed out in those teachings so far as the booklets offered in evidence are concerned, that in the slightest degree could induce anyone to commit suicide, but quite the contrary. The tenor of such booklets was "to know and understand the word of Jehovah God;" to obey and follow the law of Jehovah, and it is said in one of them that: "They that will know Jehovah and his beloved son, Christ, Jesus, and will walk in the way of righteousness, will be the recipients of his boundless blessings."

According to the evidence, the one and only person who had the opportunity to inflict the wound, aside from the deceased himself, was the defendant, and the record also establishes ample motive on her part for the alleged crime. The jury considered and weighed all the evidence in this case. We believe there is ample evidence which might appeal to their judgment as reasonable, intelligent, and honest men, and convince them beyond reasonable doubt that the defendant fired the shot that killed her husband.

Upon the application of the defendant, the case was transferred to another county, and trial was had more than 100 miles distant from the place where the crime is alleged to have been committed. The case was tried more than a year and a half after the death of Nathaniel Gibson. There is no claim, and there is no basis for claim, that the jury selected to try the case was not wholly impartial and free from prejudice. The record discloses that the jury gave the case extended consideration. They returned and asked for further instructions. Their

questions indicate that they had given careful and intelligent consideration to the case, and apparently had arrived at the conclusion to exclude the written admission as evidence in this case.

As heretofore pointed out, the instructions of the trial court directed the jury to disregard any admission that was found not to have been made voluntarily, and in this respect was more favorable than the defendant was entitled to have the court give. The record discloses that the defendant was defended with ability and zeal. There can be no doubt that the cause of the defendant was presented to the jury,—as it was to this court,—ably and forcefully. The one, and the only, basic question in issue was whether the defendant had fired the shot that killed Nathaniel Gibson. All questions that arose during the course of trial were incidental to this main question. The defendant testified in her own behalf, and denied that she shot her husband. She denied that she had told her counsel that she had shot her husband, and her counsel testified to like effect. The jury, after what must have been careful and earnest consideration of the case, reached the conclusion that their minds were satisfied beyond a reasonable doubt that the defendant had killed her husband. While, under the applicable rules, this court may not consider the assignments predicated upon the instructions to the jury, the members of this court have read the instructions with care, both those given and those refused, and without expressing either approval or disapproval of some of the instructions challenged, and some of those refused, we are of the mind no prejudicial error was committed by the court so far as concerns the instructions or so far as any other rulings upon which error has been assigned.

When the case is considered as a whole, as it went to the jury, it does not appear at all probable, that anything that was said, or done, upon which error has been predicated could, or did, affect the verdict. Upon the record presented on this appeal, we are of the view that the cause was presented to the jury fully and fairly. The jury, after careful consideration, deliberately reached the conclusion that the defendant fired the shot which resulted in the death of Nathaniel Gibson, and we are all of the view that the evidence was sufficient to justify twelve intelligent, honest, and reasonable men, in the exercise of reason and

judgment, in returning the verdict which they did return. The judgment and orders appealed from are affirmed.

CHRISTIANSON, Ch. J., and BURR, MORRIS, and NUESSLE, JJ., and HOLT, Dist. J., concur.

Mr. Justice SATHRE, being disqualified, did not participate, HON. DANIEL B. HOLT, Judge of First Judicial District, sitting in his stead.

PER CURIAM. (On petition for rehearing.) The defendant has petitioned for rehearing.

It is first contended that this court erred in considering the motion for a new trial made on November 2d, 1935, as a "second motion for a new trial and subject to the same objection as an original motion for a new trial." It is argued that, a motion for a new trial having been made within the time allowed by law, additional specifications might be made even after the time to move for a new trial had expired, and that the specifications and grounds presented by the motion noticed to be heard on November 2d, 1935, might, and should, have been considered and determined. The contention is unsound. In this case, a motion for a new trial was heard by the court on July 20th, 1935. On July 26th, 1935, the trial court entered an order denying such motion. On October 25th, 1935, the defendant caused to be served a document entitled "Notice of Motion and Additional Specifications of Error." The notice refers to the motion for a new trial first made, and further states that such "motion was denied." It then further states "that at 2 o'clock in the afternoon of the 2d day of November, A. D. 1935, the defendant Gladys R. Gibson will again move the court . . . for an order vacating and setting aside the verdict of the jury and the judgment entered thereon in the above entitled case, and for an order Granting a New Trial of said cause on the following grounds, . . ."

In this state the grounds for a new trial are prescribed by statute, and the time within which such motion must be made is also regulated by statute. This being so, a motion for a new trial in a criminal action must be made within the time fixed by the statute, and upon the expiration of the statutory period, the court ceases to have power to entertain the motion. State v. Hagan, 54 N. D. 136, 208 N. W. 947. See also 16 C. J. pp. 1120, 1121, 1210.

While a motion for a new trial is pending, a district court doubtless has power to permit ordinary amendments of the motion, and where the statutory time to move for a new trial has not expired, it also has power to permit additional grounds to be added. But, where, as here, a motion for a new trial has been made, and denied, and the time in which to move for a new trial has expired, the district court has no power to permit an additional motion for a new trial to be made. The fact that a former motion was made and denied does not extend the statutory period, or confer power upon the court to entertain a motion for a new trial after the time fixed by law has expired. On November 2d, 1935, when the so-called motion for a new trial upon additional specifications was noticed to be heard, the defendant "had no motion for a new trial pending. There was, therefore, nothing to amend. It was too late to institute such motion." People v. Wessel, 98 Cal. 352, 355, 33 P. 216.

It is next contended that this court erred in holding the written statement of the defendant to be an admission and not a confession. And it is again argued that even though such statement is an admission and not a confession the same rules should be applied in determining its admissibility as that of a confession; that the trial court should have heard evidence and determined whether it was given voluntarily before it was offered or received in evidence, and that it should not have been admitted until the trial court, after such hearing, had determined that it was given voluntarily.

These questions were considered with care before the former opinion was rendered, and are discussed at some length therein. In view of its importance in this case, we have again reviewed the authorities, and have again gone over the record in this case, and have reached the same conclusions that were stated in the former opinion.

As was shown in the former opinion, the written statement of the defendant was obtained from her by a private detective. This detective, Kulis, had been employed by the state's attorney to work on the case. After Kulis had been employed, he rented and occupied rooms in defendant's home at Dickinson. While he was living there, the defendant talked about selling her home, and Kulis agreed to procure a purchaser. Defendant's purpose in going to Jamestown was to meet the prospective purchaser. The written statement was made in a cabin

at a tourist camp near Jamestown. There is no claim that Kulis at that time, or at any time prior thereto, had even intimated that he had any connection with the state's attorney, or that he had any authority over, or interest in, the investigation in behalf of the prosecution. The uncontradicted evidence establishes quite the contrary. The evidence establishes beyond all doubt that the defendant did not know that Kulis had any connection with the prosecution, and that she was under the belief that whatever interest he had in the matter was adverse rather than favorable to the prosecution. Before the written statement was made, he showed her the gun with which Nathaniel Gibson had been shot, and told her he had stolen it from the sheriff so that it would not be available as evidence, and that he was going to "get the inquest." He told her he wanted to help her, that he belonged to a gang in Chicago. Later, when the defendant was called and testified as a witness in her own behalf, she testified that the statement had been obtained from her by threats, but when asked by her own attorney if Kulis told her why he wanted the written statement, she answered: "Yes, so that I wouldn't tell anybody, so that I could be with his gang and wouldn't tell what he had done to me, that is what he wanted it for, that is what he told me."

We adhere to the views expressed in the former opinion:—the written statement did not constitute a confession, but is an admission, and without the scope of the confessions rule.

It is next contended that in the former opinion, we overlooked a specification of error predicated upon the denial of a motion to strike the written statement of the defendant and certain oral statements made by her during the conversation had preceding and following the making and delivery of such statement on the ground that according to the evidence the written statement was but a part of a statement partly in writing and partly oral made by the defendant; that the oral statements and the written statement construed together constituted a confession, and that it was inadmissible because not given freely and voluntarily. The motion to strike was made at the close of the state's case. It was followed by another motion to strike the written statement on the ground that it had not been given voluntarily. Both motions were followed by motions to strike certain other evidence.

A number of assignments of error were based upon the admission of

the written statement. Among such assignments was one predicated upon the motion to strike the same. The several assignments were grouped and argued together. The other specifications were predicated upon the proposition that the written statement (exhibit 29) constituted a confession and not an admission, and that the trial court should have heard evidence relating to its admissibility in absence of the jury, and that the question whether it was voluntarily given should not have been submitted to the jury, but should have been determined by the court.

The record discloses the following as regards the introduction in evidence of the written statement: It was first shown to a witness who testified that he was familiar with the handwriting of the defendant, and that the statement was in her handwriting. But the statement was not then offered in evidence. Apparently there had been some discussion between counsel and the court concerning the admissibility of the statement, not set forth in the record, because the next reference to the written statement occurs in certain proceedings had in chambers out of hearing of the jury, but in the presence of the defendant and her counsel. It appears from what was then said, that written briefs had been submitted to the trial court upon the question whether the statement was an admission or a confession. Counsel for the state stated that it was his contention that the written statement was an admission and did not fall within the confessions rule. In response to an inquiry by the court, he stated that he proposed to offer the statement in evidence, but that he would probably have a witness testify concerning a conversation overheard at the time the statement was given. Counsel for the defendant stated that it was his position that the statement had not been given freely and voluntarily. He further stated: "We know the manner in which this confession was had and we know the party who obtained it. We know that the state does not wish to present him in court here to vouch for his word, and that the purpose of this move is to avoid presenting him in court here and to vouch for his word. It is to put the burden upon this defendant rather than upon the state in the first instance to show that this confession was a voluntary one and one that should be received in a court of Law. . . ."

The trial judge then announced that he was of the mind that the statement constituted an admission and not a confession. The court

further said: "I don't believe that this question of deciding that this is an admission puts the state in such a position that they can simply offer this document and throw the burden of proof upon the defendant. I don't believe that. I believe that when the state offers this admission, they must offer it with all the surrounding circumstances and evidence under which it was produced, and the defense, of course, have a right to meet that issue, and the question then as to whether or not this admission was voluntarily made is a question for the jury. I don't know whether counsel agrees with me, but that is the ruling of the court."

Defendant's counsel excepted to the ruling. Thereafter, the following proceedings were had in the courtroom in the presence of the jury. Kulis, the detective who had obtained the written statement from the defendant, was called as a witness. After he had been examined at some length (his testimony given before the written statement was offered and received in evidence occupies some 39 pages of the typewritten transcript), the written statement was offered in evidence. Defendant's counsel thereupon interposed the following objection: "That is objected to on the grounds that no proper foundation has been laid for the admission of the exhibit, that it appears from the witness' own testimony that this was not freely and voluntarily given, that it was given under duress at a lonely cabin on the outskirts of Jamestown between the hours of 1:30, after the hours of 1:30 in the morning; that he had a gun with him there present at that time; that this woman was alone with him in that cabin; all of which facts go to show that the same was not freely and voluntarily given; that no proper foundation for its introduction has been had." The objection was overruled and the statement admitted.

At the time the objection was made there was no evidence of any promise by someone whom the defendant believed to be a person in authority, nor was there evidence of any threat. There was no request for leave to cross-examine, or that the ruling be withheld until further proof was made as to the circumstances under which the statement was given. The situation of the parties, the time and the place the statement was made, and the other facts that the evidence then disclosed were not such that it must or could be said as a matter of law that the statement was not made voluntarily. If the same proof that had been introduced up to that time had been presented to the court in the ab-

sence of the jury, and the court had held that the statement had been given voluntarily and was admissible in evidence, the ruling could not have been disturbed on appeal. Whether a written statement, which on its face seems to be complete, is so in fact, and should be so treated as evidence, is a matter primarily for the trial court to determine, and in making such determination the court is vested with some discretion. The same is ordinarily true as to a motion to strike evidence. It was for the trial judge to determine whether the written statement was complete in itself or whether it was merely a part of another and larger statement. The "Best Evidence Rule" was applicable to the written statement, and the contents thereof could not have been shown by parol unless the inability to produce the writing was so established as to permit secondary evidence of the contents. 3 Enc. of Evidence, pp. 276, 282; 2 Chamberlayne, Modern Law of Evidence, § 1573. The written statement was offered in evidence on the theory that it was complete. The objection to its admission contained no intimation that there was any contention that it was incomplete. The objection was rather on the theory that it was complete and inadmissible as such because not voluntary. The statement was, in a very real sense, separate from the oral statements that the witnesses for the prosecution testified that the plaintiff made in the course of the conversation during which the written statement was made. The jury might well have believed that the defendant did make the written statement, and at the same time have believed that she did not make any of the oral statements attributed to her. When the defendant subsequently testified in her own behalf, she admitted that she had written and signed the written statement, but as we read the testimony, she did not admit that she made any of the oral statements attributed to her, and which defendant's counsel claims operated to transform the written admission into a confession.

The motion to strike was made after the state had rested its case. The several witnesses for the prosecution had testified as to the conditions and circumstances under which the alleged statements, both oral and written, had been made. If the trial court, instead of adopting the procedure which he did, had heard all of the evidence that had been submitted up to the time the motion to strike was made in the absence of the jury, and had ruled the statements, both oral and written, to be admissible, the ruling could not have been disturbed on appeal.

Appellant's counsel assumes that if the statement constituted a confession, the procedure adopted by the trial court in submitting the question of its admissibility to the jury constituted prejudicial error under the rule laid down by this court in State v. Kerns, 50 N. D. 927, 198 N. W. 698, and he argues that even though it did not constitute a confession, that the character of the admission was such that the same rule should be applied in testing its admissibility and that evidence relating to its admissibility should have been heard by the trial judge in the absence of the jury, and the question determined by the trial judge, and not submitted to the jury; and that consequently, under the rule laid down in State v. Kerns, supra, there must be a reversal.

Counsel's assumption is not warranted by anything that was ruled, or said, in the decision in State v. Kerns. It is true that in the decision in that case this court held that the questions relating to the admissibility of a confession are to be determined by the trial judge. It was shown, however, that many courts have held to the contrary; that some courts have held that where there is a conflict in the evidence touching the matter, the question must be submitted to the jury; that others have held that the question is one determinable by the court, but that the court may properly submit the question to the jury as a matter of grace to the defendant. 50 N. D. 927, 198 N. W. 698.

The procedure that actually had been followed in the trial of State v. Kerns was not that which this court approved. In that case the trial court heard evidence in the absence of the jury, relating to the admissibility of the confession, and after hearing such evidence, stated that he found that the confession had been given voluntarily. At the time this view was announced, the confession had not been offered, nor was it then offered, in evidence. After the court had thus stated its views, the trial proceeded before the jury, and the witnesses who had been examined before the court were placed upon the witness stand and testified at length substantially to the same effect as they had testified before the court. The confession was then offered in evidence and an objection was made on the ground that it had not been given voluntarily. The trial court overruled the objection and the confession was admitted. But the matter did not rest here; the court submitted to the jury the question whether the confession was admissible in evidence at all. The court instructed that the jury should consider all testimony

tending to show the circumstances surrounding the giving of "such alleged confession," as "bearing upon whether there was a confession and whether the confession, if made, should be considered by the jury." The court further instructed the jury that if they failed to find that the alleged confession was given freely and voluntarily, they "should wholly disregard such confession," but if they believed that "there were no promises or threats made to the defendant which were fairly likely to produce an untrue confession" then they should consider it with all the other testimony in the case. 50 N. D. 939, 198 N. W. 702. In considering assignments of error based upon these instructions, this court said: "If error there was, it was error in favor of rather than against the defendant, to the extent that the instruction left it for the jury to say whether it was admissible." 50 N. D. 940, 198 N. W. 702. The procedure that was adopted in the trial of State v. Kerns was therefore not in accord with that which this court said was the correct method. The procedure adopted was that which Dean Wigmore has characterized as "unpractical heresy" (2 Wigmore, Evidence, 2d ed. p. 218), as it permits the jury to sit in judgment upon, and review the correctness of, the ruling of the trial court.

It will be seen that this court did not hold, in State v. Kerns, that it necessarily was error prejudicial to the defendant to submit to the jury the question whether a confession had or had not been given voluntarily. On the contrary, it was recognized in that case that the practice adopted was error in favor of the defendant rather than error to his prejudice.

The trial court adopted the view that the written statement constituted an admission and not a confession. He further adopted the view that not any of the statements or admissions made by the defendant against her interest should be considered as evidence unless the state proved that they had been made freely and voluntarily. He further took the position that he would submit to the jury the question whether they were made freely and voluntarily, and that the jury should be instructed to disregard wholly any, or all, statements or admissions that had not been made voluntarily. In carrying out this purpose, the trial court gave to the jury careful and explicit instructions. At the threshold of that portion of the instructions which relates to the alleged admissions of the defendant, the court instructed the jury as follows:

"There has been offered and received in evidence, Gentlemen, in this

case, certain testimony by which the state claims that the defendant, Gladys Gibson, has admitted orally and in writing that she shot and killed her husband, Nathaniel Gibson . . . .

"These oral or written statements alleged to have been made by the defendant, Gladys Gibson, have been referred to during the trial of this action rather loosely, sometimes as admissions and sometimes as confessions."

The court then defined "confession" and "admission."

Thereupon, the court instructed the jury that in arriving at their verdict they should not "take into consideration any oral or written statements or admissions or purported or so-called confessions or actual confessions" unless: (1) They found, and believed and were satisfied from the evidence, that they were in fact made; and (2) they found, and believed and were satisfied, that they were made voluntarily; and (3) they found and believed that they are true. Immediately following such instruction, the court charged the jury:

"The burden of proving any admission or statement or so-called or purported confession or actual confession alleged to have been made by the defendant in this case was voluntarily made is upon the state.

"In this connection I charge you that no oral or written statement or admission or so-called or purported confession, or an actual confession of the defendant in a criminal action such as this, can be considered by the jury in passing upon the question of the guilt of such defendant if such oral or written statement or admission or so-called confession or purported confession or any actual confession has been procured or obtained by threats, or by putting the defendant in fear, or by any methods of intimidation, or compulsion, or duress practiced upon such defendant, or upon any promise of immunity or reward held out to such defendant as an inducement for making such admission.

"So in this case if you find from the evidence that any statement or admission or purported confession or so-called confession or an actual confession, either written or oral, made by the defendant Gladys Gibson touching upon the circumstances surrounding the death of Nathaniel Gibson and tending to connect her with his alleged murder, if you find she made any such oral or written statements or admissions or purported confessions or actual confessions, were not her free and voluntary act but were induced or secured by threats, or force, or compulsion, or

by putting her in fear, or by any offers or promises of reward or immunity, then you will totally disregard such statements, admissions or confessions thus secured. . . .

"I instruct you that if you find from the evidence in this case that the defendant Gladys Gibson did make any oral or written statements or admissions or purported confessions or actual confessions tending to connect her with the death of Nathaniel Gibson, then I charge you that in determining whether or not such oral or written statements or admissions or purported confessions or actual confessions were in fact voluntarily made or involuntarily made you have a right to and should take into consideration all the circumstances surrounding the making of such oral or written statements or admissions or purported confessions or actual confessions. You should take into consideration the place where they were made; who was present; the time of the day or night; the conduct of all parties at the time; whether or not the defendant was under arrest, whether or not she was in the custody of officers and whether or not she was in jail or elsewhere; the person or persons to whom such oral or written statements or admissions or purported confessions or actual confessions were made; the state of the defendant's mind at the time, if it can be ascertained from the evidence; whether she had or had not consulted with her attorney or attorneys; the reasonable and probable effect upon the defendant of all the surrounding circumstances leading up to and at the time of the making of such oral or written statements or admissions or purported confessions or actual confessions as disclosed by the evidence; and taking all of these matters into consideration determine whether or not such oral or written statements or admissions or purported confessions or actual confessions were in fact voluntarily made by the defendant or whether they were not. If you find that any of them, if so made, were not voluntary, then those you will discard and totally ignore and give them no weight and no consideration in arriving at your verdict in this case. On the other hand if you believe from the evidence that any of them were voluntarily made, then those you may consider in arriving at your verdict and give them such weight as you deem they are entitled to under the evidence and these instructions. But in considering such statements or admissions, you must consider the whole of such statements or conversations together."

These instructions are clear and comprehensive. They gave to the jury the same rules of admissibility as to all statements that the court would have applied if it ruled on the admissibility of a confession. The question as to whether any of the statements made by the defendant were given voluntarily was not one of such complexity as to be beyond the comprehension of the jury, or beyond its capacity to determine by application of the rules submitted by the court in the instructions.

It is not apparent to us that any prejudice to the defendant did result, or could have resulted, from any ruling or action taken by the trial court concerning the statements claimed to have been made by the defendant.

It is next contended that this court erred in holding that objections to the court's instructions were waived because exceptions thereto were not filed by the defendant with the clerk of the district court within twenty days after the instructions were filed. It is conceded that the former opinion in this case is in accord with former decisions of this court upon this question; but it is again argued that these decisions are incorrect and should be overruled. We have again considered the question and are agreed that the former decision is correct.

Unless abrogated by statute, it is the general rule that proper and timely exceptions must be taken in the trial court to the instructions to the jury, and the failure to take such exceptions constitutes a waiver of the right to object. 16 C. J. p. 1070. Generally, and in absence of statute to the contrary, exception must be taken before the jury retires. 16 C. J. p. 1071. This rule prevailed in the Territory of Dakota in both civil (Cheatham v. Wilber, 1 Dak. 335; Code Civ. Proc. D. T. 1867, § 217), and in criminal (Code Crim. Proc. D. T. 1877, §§ 412, 414) cases. The rule was changed in 1877 so as to permit exceptions to be taken in civil actions at any time before the entry of final judgment in the case (Code Civ. Proc. D. T. 1877, § 249; Comp. L. D. T. 1887, § 5049); but it remained as to criminal actions, became the law of this state (N. D. Const. Schedule § 2), and continued in force until the enactment of the Revised Codes of North Dakota, 1895. Rev. Codes 1895, §§ 8178, 8179, 8269.

The provisions of §§ 10,824, and 10,825, Comp. Laws 1913, were originally part of the same legislative enactment. Laws 1893, chap. 84.

Prior to such enactment oral instructions were not authorized either in civil or criminal actions. Comp. L. D. T. 1887, § 5048.

Sections 10,824, 10,825, 10,915, Comp. Laws 1913, were enacted in their present form in the 1895 Revised Codes of North Dakota, and have remained in force without change. Rev. Codes 1895, §§ 8178, 8179, 8269; Comp. Laws 1913, §§ 10,824, 10,825, 10,915. These sections were based upon chapter 84, Laws 1893. Before the enactment of said chapter 84, Laws 1893, oral instructions were not authorized in either civil or criminal actions. Comp. L. D. T. 1887, § 5048. Prior to the enactment of the 1895 Revised Codes, appeals did not lie in a criminal action. Review of the instructions to a jury could be had in the supreme court only by writ of error, upon a bill of exceptions, in which the portions of the charge excepted to were distinctly stated. Comp. L. D. T. 1887, §§ 7499, 7502, 7439–7442, 7511. Not only were exceptions to the instructions required to be taken promptly, but it was, also, provided that unless the court otherwise directed, the bill of exceptions, setting forth the exceptions to the instructions, "must be settled at the trial." Comp. Laws 1887, §§ 7439, 7441.

Sections 10,824 and 10,825, Comp. Laws 1913, read as follows:

"Upon the close of the trial all instructions given or refused, together with those prepared by the court, if any, must be filed with the clerk, and except as otherwise provided in the next section shall be deemed excepted to by the defendant. If the charge of the court, or any part thereof, is given orally, the same must be taken down by the official stenographer and shall be deemed excepted to by the defendant, and the same as soon as may be after the trial must be written out at length and filed with the clerk of the court by the stenographer thereof; provided, that in case the defendant is acquitted by the jury the oral instructions need not be transcribed or filed with the clerk. But exceptions in writing to any of the instructions of the court in any manner given, or the refusal of the court to give instructions requested, may be filed by the defendant at his discretion, with the clerk of the court within twenty days after the instructions are all filed as herein provided. The stenographer of the court shall receive for writing out the oral instructions of the court the same fees as for making transcripts."

The court may, in its discretion, submit the written instructions which it proposes to give to the jury, to the counsel in the case for ex-

amination, and require such counsel after a reasonable examination thereof, to designate such parts thereof as he may deem objectionable, and such counsel must thereupon designate such parts of such instructions as he made deem improper, and thereafter only such parts of said written instructions so designated shall be deemed excepted to, or subject to exception."

Section 10,822, Comp. Laws 1913, provides that "all instructions must first be reduced to writing, unless by consent of both parties entered in the minutes, the instructions are given orally and taken down by the stenographer of the court, in shorthand."

Section 10,824, supra, recognizes that instructions may be given either in writing, or orally; and it reiterates the requirement of § 10,822, that in case they are given orally, they must be taken down by the official stenographer; and it further provides that, unless the defendant is acquitted, they must be written out at length and filed with the clerk of the court. The section provides that all instructions, given or refused, written or oral, "shall be deemed excepted to by the defendant." As to written instructions, one of two things may be done: (1) The court may submit the instructions which it proposes to give to the counsel in the case, and "require such counsel after a reasonable examination thereof, to designate such parts of such instructions as he may deem improper," supra, § 10,825; or, (2) the court may give the instructions, without such submission. In either case the instructions are required to be filed with the clerk. If the first method is adopted, "only such parts of said written instructions" as counsel designates as objectionable are "deemed excepted to, or subject to exception." Supra, § 10,825. If the second method is pursued, the instructions are all deemed excepted to, and "exceptions in writing to any of the instructions . . . given, or the refusal of the court to give instructions requested, may be filed by the defendant at his discretion, with the clerk of the court within twenty days after the instructions are all filed." Supra, § 10,824. If the instructions are oral, they are all deemed excepted to when given, and if defendant is convicted, they must be written out as soon as may be after the trial, and filed with the clerk of the court, and "exceptions in writing to any of the instructions . . . given, or the refusal of the court to give instructions requested, may be filed by the defendant at his discretion, with the clerk of the court

within twenty days after the instructions are all filed." Supra, § 10,824.

The provision in § 10,824, supra, concerning the filing of written exceptions within twenty days after the instructions are filed with the clerk of the court has no application to instructions that are submitted to counsel, and opportunity given to take exception under § 10,825, supra; such provision applies only to instructions in writing given to the jury, and that have not been so submitted, and to instructions that have been given orally and taken down by the official stenographer of the court and transcribed and filed with the clerk of the court.

The provision in §§ 10,824, and 10,915, that the instructions "shall be deemed excepted to" is not inconsistent with the necessity of taking further action to place of record and make effective the exception thus takn by operation of law. See Lambert v. Brown, 22 N. D. 107, 132 N. W. 781; Kleppe v. Odin Twp. 40 N. D. 595, 169 N. W. 313. As has been shown, under the law in force when §§ 10,824 and 10,915 were enacted, a defendant in a criminal action who desired to base error upon instructions to the jury was required: (1) To take exception at the trial to any instruction he desired to challenge; and, (2) to preserve and make effective the exception taken by having the same embodied in a duly settled bill of exceptions. Sections 10,824 and 10,-915 dispensed with the necessity of taking exceptions to the instructions when they were given. The law says the instructions shall be "deemed" excepted to, that is, they shall be considered "regarded as being" excepted to. 3 Century Dictionary & Cyclopedia, New Standard Dictionary, Webster's New International Dictionary. But these sections did not dispense with the necessity of taking further action to preserve and make effective the exception deemed taken, by filing written exceptions to the particular portions of the instructions, which, upon examination of the instructions, were found to be objectionable. If it was the intention that no action need be taken to designate the particular instructions objected to, and that the exception deemed taken was effective as a basis for assignment of error on motion for a new trial or on appeal without further action on the part of the defendant, then the filing of written exceptions would be worse than useless, and it is inconceivable why any such provision was placed in the statute at all.

The legislature intended to give a defendant in a criminal action opportunity to examine the instructions before he was required to designate the parts he regarded as being objectionable. So it provided that if the court gave written instructions, the court must either give defendant's counsel a reasonable time to examine the instructions before the charge was given to the jury so that counsel might designate the parts of the instructions he considered objectionable; or if the court did not give defendant's counsel such opportunity to except to the instructions, then the instructions must be filed with the clerk, and defendant, if he so desired, might file written exceptions to such parts as he considered objectionable, within twenty days after the instructions were filed. If oral instructions were given, there would be no opportunity to designate the objectionable instructions before they were given to the jury, and in such case the defendant was given twenty days after the instructions, as transcribed by the official stenographer, have been filed with the clerk of the court to file exceptions in writing to the parts deemed to be objectionable. But the legislature did not intend to permit error to be predicated upon a general exception to the instructions. When the court submits the written instructions to counsel under § 10,825, counsel must "designate such parts of such instructions as he may deem improper, and thereafter only such parts of said written instructions so designated shall be deemed excepted to, or subject to exception." When the court gives oral instructions, or gives a written charge, without submitting the same to counsel for examination before delivery thereof to the jury, the law preserves to the defendant the right to except to any part of the instructions he may deem improper. It would not be possible to designate the parts deemed to be improper, unless reasonable time were given to examine the instructions. So the law says, if you have not had an opportunity to make "a reasonable examination" of written instructions, or if oral instructions are given, then the instructions will all be deemed excepted to, so that you may make "a reasonable examination" before you are required to designate the parts you deem improper. You will be given twenty days after the instructions in writing are filed in the office of the clerk of the court to examine them, and then in your discretion, that is, acting wthout other control than your own judgment (3 Century Dictionary & Cyclopedia) you may determine whether you deem any part of the instructions improp-

er, and you may file written exceptions designating the parts you deem improper at any time within such twenty days.

It is argued in the petition for rehearing that we are in error in the former opinion in assuming that the letters from Elnora Donis to the defendant were admissible for any purpose other than to show bias in favor of the defendant, and it is claimed that there were no statements in such letters contrary to the testimony which she had given. As we read the record, the letters were admissible not only for the purpose of showing bias, but also because there was a contradiction between her testimony and the statements in the letters. We quote from her testimony given before the letters were offered and received in evidence:

"Q. Did you ever write to her that your sister had the goods on her and Joe, or something to that effect?

"A. I don't remember.

"Q. You don't remember? A. I don't remember writing anything like it.

"Q. Would you say that you did not write?

"A. I can say I did not write it."

In one of her letters to the defendant, she refers to the fact that her brother, Joe Donis, had been down at Austin, Minnesota, and that while there he had talked with their sister (Mickey). She then says, "When Joe was down here and told her all about Than, she said, 'He knows darn well I got a lot on him and G.'" We adhere to the statement made in the former opinion: "In so far as the argument of the state's attorney called to the attention of the jury the contradiction between the testimony of Elnora Donis upon the trial and the statements formerly made in her letters; and in so far as he called to the attention of the jury the bias and interest of Elnora Donis in favor of the defendant as evidenced by the statements in her letters; and in so far as he questioned the credibility of Elnora Donis and the weight to be given to her testimony, the argument was wholly proper."

Appellant next contends that it was the duty of the court to instruct the jury that the letters written by Elnora Donis to the defendant could be considered only for the purpose of impeachment of the testimony of Elnora Donis, and that it was prejudicial error for the court to fail to do so, even in the absence of a request. It is the general rule in this state that nondirection is not prejudicial error unless it amounts to mis-

direction. See State v. Guffey, 39 S. D. 84, 163 N. W. 679; State v. Haynes, 7 N. D. 352, 75 N. W. 267; State v. Rosencrans, 9 N. D. 163, 82 N. W. 422; State v. Glass, 29 N. D. 620, 151 N. W. 229. The instructions to the jury in no manner gave the jury to understand that the letters could be considered for any purpose other than in passing on the credibility of Elnora Donis, and the weight to be given to her testimony. At the time they were admitted in evidence, the court clearly stated that was the purpose for which they were admitted. Nothing was said in the instructions from which any inference might be drawn that there had been any departure from the views expressed by the court at the time the letters were received in evidence.

It is claimed that this court erred in holding in the former decision that no prejudicial error was committed by the trial court in admitting evidence as to the statements made by the defendant at the coroner's inquest. It is again argued that the admission of this evidence violated the constitutional guaranty against self-incrimination. It is also argued that it was error to permit the court reporter who took down the testimony in shorthand at the inquest to testify as to the statements then made. It is said the transcript of the testimony constituted the best evidence and that the testimony of the reporter was inadmissible. We have again considered the question, and are satisfied with what was said in the former opinion concerning the question whether the admission of the testimony given by the defendant upon the coroner's inquest violated the constitutional guaranty against self-incrimination. There was no violation of such constitutional guaranty.

As shown in the former opinion, after the reporter had given testimony, the defendant offered in evidence the entire transcript of all the testimony given by the defendant at the coroner's inquest. The testimony of the reporter was in fact given from such transcript, as he used the transcript for the purpose of refreshing his memory. We know of no valid reason why the reporter might not testify to statements made upon the coroner's inquest, and use his notes for the purpose of refreshing his memory. In any event, the transcript itself was offered and received in evidence. There is no contention that there is any variance between the testimony of the reporter as to the statements made by the defendant at the coroner's inquest and the transcript of her testimony

subsequently offered in evidence by the deefndant and received in evidence without objection, and the record discloses there was no variance.

It is contended that the construction placed on § 9459, Comp. Laws 1913, is incorrect; and it is again argued that the statute requires that both the death of the person alleged to have been killed and the further fact that the death was produced through a criminal agency must be established by direct proof, and that even though the fact of death has been established by direct proof, the confession or admission of the accused is not admissible to prove that the death was produced through a criminal agency. We have again considered this question, and adhere to the views expressed in the former opinion.

Finally it is said that this court "failed to consider the cumulative effect of the errors which it recognized," and that "where there is reasonable ground to doubt that on the whole record the defendant had a fair trial, a new trial should be granted."

As shown in the former opinion, and in this opinion, this court has considered not only the questions properly preserved for review in the trial court, and presented on this appeal, but we have examined the record upon which assignments of error not so preserved and presented are based. The entire record has been read and reread. The case has been argued twice. In view of the importance of the case, the length of the record, and the questions raised, counsel were not limited as to time. Extended briefs were filed, and leave was granted to file additional briefs. Every question presented was considered with much care and deliberation before the former decision was made; it has again been considered on the petition for rehearing. The members of this court have given to this case their most anxious thoughts and labor, and have reached the conclusion that the defendant had a fair trial.

There was only one question at issue: Did the defendant fire the shot that killed her husband, Nathaniel Gibson? When the case went to the jury, the evidence was such that honest, intelligent, and reasonable men could reach only one of two conclusions: either the defendant fired the shot, or Nathaniel Gibson committed suicide.

In the briefs, and on the oral argument in this court, defendant's counsel contended with much earnestness and ardor that Nathaniel Gibson committed suicide. The record discloses that the same contention was made in the court below, and (as is shown in the former opinion)

considerable evidence was adduced by the defendant for the sole purpose of showing that the deceased had committed suicide. In view of the prominence this phase of the case was given, there might have been some danger that the jury, or some members thereof, might have inferred that some burden rested upon the defendant to establish the fact, which she had introduced evidence tending to establish. The court took care to give instructions to insure that the jury might not be led astray to the prejudice of the defendant. We quote from the instructions:

"The theory advanced by the defense in this case is that the said Nathaniel Gibson took his own life and that he committed suicide by shooting himself with the revolver.

"Now, I charge you that it is not your province in this case to determine whether or not Nathaniel Gibson committed suicide or whether he came to his death in some other manner than that charged in the information against the defendant, but your sole duty is to determine the one and single question, and that is, whether or not the defendant Gladys Gibson fired the shot which killed her husband and whether she did it intentionally, feloniously, with premeditation and with malice aforethought.

"I further charge you that no duty rests upon the defendant in this case to prove that Nathaniel Gibson took his own life or to prove how Nathaniel Gibson was killed. The defendant having entered a plea of 'not guilty' in this case casts upon the state the burden of establishing to your satisfaction beyond a reasonable doubt that the defendant Gladys Gibson killed her husband in the manner charged in the information and that she did it wilfully, intentionally, unlawfully, feloniously, with premeditation, and with malice aforethought.

"So, Gentlemen of the Jury, the first question which you must answer when you retire to your jury room is this: Did the defendant Gladys Gibson fire the shot from the 32-caliber revolver on the 5th day of December, 1933, which the state alleges killed her husband Nathaniel Gibson? If the state has failed to establish that fact to your satisfaction beyond a reasonable doubt, then I charge you that you need go no further in your deliberations and it would be your duty to return a verdict of 'not guilty.' "

The trial of this case occupied in all some eighteen days. The transcript of the proceedings fills eight volumes contining more than twen-

ty-three hundred pages of typewritten matter, exclusive of the court's instructions to the jury and some documentary evidence. In the opinions in this case, reference has been made to the incidents at the trial upon which error has been predicated. When the case is considered as a whole, it evinces on the part of the trial court a careful and painstaking consideration for the rights of the defendant and care in safe-guarding those rights under the law as the trial court interpreted and applied it. There was presented to the jury, forcibly and clearly, the one question: "Did the defendant, Gladys Gibson, fire the shot that killed her husband Nathaniel Gibson?" The attention of the jury was focused upon this single question. The jury, selected at a place and under circumstances tending to obtain triers of fact free from passion and prejudice, answered this question in the affirmative, and they gave to the defendant the benefit of any doubt they may have had as to the degree of the offense. After carefully considering all the questions presented in the petition for rehearing, we reach the same conclusion that we did in our former opinion: "When the case is considered as a whole, as it went to the jury, it does not appear at all probable, that anything that was said, or done, upon which error has been predicated could, or did, affect the verdict. Upon the record presented on this appeal, we are of the view that the cause was presented to the jury fully and fairly. The jury, after careful consideration, deliberately reached the conclusion that the defendant fired the shot which resulted in the death of Nathaniel Gibson, and we are all of the view that the evidence was sufficient to justify twelve intelligent, honest, and reasonable men, in the exercise of reason and judgment, in returning the verdict which they did return."

The petition for rehearing is denied.

NUESSLE, Ch. J., and CHRISTIANSON, BURR, and MORRIS, JJ., and HOLT, Dist. J., concur.